[Crim. No. 5172. In Bank. July 27, 1951.]

THE PEOPLE, Respondent, v. RAY CULLEN, Appellant.

J. David Hennigan and Robert M. Wiley for Appellant.

Fred N. Howser and Edmund G. Brown, Attorneys General, Elizabeth Miller, Deputy Attorney General, William O. Mackey, District Attorney (Riverside) and Ray T. Sullivan, Assistant District Attorney, for Respondent.

SHENK, J.—The defendant was tried by a jury and found guilty on two counts of murder in the first degree without recommendation. The death penalty was imposed and this automatic appeal followed. There was no motion for a new trial.

By indictment the defendant was charged with the murder of his wife, Mary Cullen, and of her father, Daniel T. Boyer, on or about January 3, 1949, in Riverside County. The indictment also alleged two prior convictions, assault with a deadly weapon and counterfeiting. The indictment was returned on March 1, 1950, and the defendant was arraigned on March 6th. He was then present without counsel and the public defender was appointed to represent him. A motion to dismiss the indictment on the ground that the defendant was denied a speedy trial was denied. The defendant pleaded not guilty and admitted the alleged prior convictions. April 25, 1950, was designated as the date when the trial should commence. In the interim the defendant moved for a change of place of trial to the county of Fresno on the ground that people of Riverside County were so prejudiced against him

that a fair and impartial trial could not be had in that county. The motion was denied. At the defendant's request another attorney was associated in his behalf with the public defender.

On May 2, 1950, after examination of the veniremen, the defendant challenged the entire panel and renewed his motion for change of venue. The challenge was disallowed and the motion denied. After a protracted trial the case was submitted to the jury on the instructions of the court at 6:51 p. m. of July 21, 1950. The jury returned the verdicts at 12:30 a. m. of July 22d.

The record discloses the following: On August 17, 1948, the defendant, then about 61 years of age, and Mary Cullen who was about 57, were married in Yuma, Arizona. They lived in the defendant's cabin on the west bank of the Colorado River in a sparsely settled region of Riverside County about 3 miles from the town of Blythe. Mary had been previously married and owned a home in Colton which she rented after her marriage to the defendant. She owned real property in San Bernardino and owned but had sold real property in Yucaipa. She took with her to the home near Blythe rather complete household furniture, furnishings and appliances. She had three grown sons, Frank, Al, and William Patton, who lived in Southern California. She had three sisters including Sophie Patton and Bessie Hart. These relatives visited and corresponded with her frequently. In December, 1948, Mary's father, Daniel T. Boyer, about 81 years of age, went to live with the Cullens. He was a war veteran and received a monthly pension check of $120.

Sometime in December, 1948, Mary Cullen began preparations for leaving Blythe and returning to her Colton residence. She made arrangements for a furniture dealer to buy some and to remove other appliances and items of furniture to Colton. She packed her belongings preparatory to hauling them in her car which she had reconditioned for the journey. She wrote to her son William about December 29th saying she did not "want anything from him only to get away," and again on the 31st that as soon as she could sell she was "coming down," and that she had asked the tenants for possession of her house in Colton by February 1st. Her son Al and sister Sophie also received letters written the same day. They did not hear from or see her thereafter. Mary Cullen and her father were seen the last times at the Cullen home on January 2, 1949, at 12:30 p. m. by a neighbor who called after she had observed the defendant depart for Blythe, and in the

afternoon about 3. Their disappearance was complete and there has been no trace of them either alive or dead.

The defendant was employed at a café in Blythe and his shift commenced about noon. He usually drove to town with Mary and her father about 10 in the morning, and returned before departing for work. He was not observed to make his customary morning trip on Monday, January 3, 1949, but departed for his employment as usual. On that day he presented to the bank in Blythe for payment and collected the proceeds of Boyer's pension check of $120 endorsed with the names "Daniel T. Boyer" and "Ray Cullen."

At 10:30 a. m. on Tuesday, January 4th, men from the sheriff's office took a boat on a routine patrol of the river. They passed the Cullen place and saw no activity, but about a quarter of a mile below they observed an unoccupied boat near the California bank right side up and stopped by a piece of driftwood, but they did not examine it further. About that time the defendant entered the office of a real estate broker whom he had previously consulted about selling his place on the river. The defendant told the broker that his wife and her father had drowned when they were out in a boat trying to get a duck which they had shot that morning while the defendant was working around the place; that he had heard the motor sputter and after a few minutes looked to see what they were doing and that he didn't see them any more. He said he had been trying to locate them and offered $100 to anyone who found them. The broker said it was not necessary, that all he had to do was to call the sheriff's office. About noon the defendant appeared at the sheriff's office and asked where he could get a boat to look for his wife and her father who had disappeared that morning; that the last he had seen of them they were drifting down the river and he was certain they would drown if he could not get help at once. He was told that a boat had gone downstream and would probably overtake them and tow them to a landing. On his return to Blythe he reported to a neighbor that Mary Cullen had shot a duck and with her father had gone out in a boat and he was afraid something had happened to them. About 6 o'clock on the morning of either Tuesday or Wednesday the defendant appeared in his red "pick-up" truck at a service station. His shoes and the bottom of his trousers were muddied. He said he guessed his wife had drowned; that she had shot a couple of ducks the evening before she had gone with her father in a boat to pick them up; that he had not been able to

find the deputy sheriff. About 3 o'clock on the afternoon of January 4th two men who were looking for the missing people found the Cullen boat a quarter mile downstream 10 feet from the bank with 16 feet of chain attached partly tangled in a fallen mesquite tree. There were 20 or 30 gallons of water in the boat and an old hat belonging to Boyer. The gas valve was shut off. The boat was of a light but safe type with a motor which with the gas shut off would run about 30 seconds on the gasoline in the carburetor. Mary Cullen was a good swimmer.

On the night of January 4th the defendant telephoned William Patton in San Bernardino and reported that his mother and Boyer were lost in the river and that the sheriff's office had boats out looking for them. Six relatives and friends arrived that night. There was a light in the house but the defendant delayed a few minutes before answering their call. Everything in the house was neat and clean. Mary Cullen's and Boyer's possessions were packed, but not the defendant's. A .22-.410 over-and-under gun that William had given to his mother was standing in a corner. He broke the gun and saw that the .410 barrel was loaded and that the .22 barrel was empty. William took off his shoes to lie on the davenport and stepped on a rug which wet the sole of his foot. Al Patton noticed another wet rug. The defendant explained that Mary had washed the rugs and they had frozen. Boyer's watch, which he usually wore, was on the buffet. The next morning they opened the icebox and saw only some mildewed food and eggs. During the night the defendant was busy at intervals outside the house, and just before daybreak for about a half hour. On being questioned he reported that he had picked up Boyer's pension check at the general delivery window and that Boyer had cashed the check himself when the defendant took him into town on Monday. Later, on the 6th, he said that Boyer was too sick to go to town but had endorsed the check and that he (the defendant) had cashed it. The evidence justifies the conclusion that the defendant forged Boyer's name by the endorsement. That fact was established on the conviction of the defendant of such forgery as hereinafter related.

After daylight on the 5th the visiting party examined the boat and used it to search the river. They also hired an airplane to view the territory. The defendant aided in these searches. The party left the Cullen home on the 6th at the suggestion of the sheriff's office after complaint by the de-

fendant that they were stealing his papers, but they continued to search the area. On January 27th fresh footprints were found after a rain. They led from the house to some brush and returned. About 150 yards from the house a freshly dug hole about 3 feet in diameter had been filled in, and the tracks led to another similar recently filled-in hole about 50 feet distant. On the 29th with the aid of a deputy sheriff they dug into the holes for about 4 feet finding the earth mixed with twigs, leaves and recently severed roots. On that day Mr. Boyhtari, a neighbor who had been hired by the defendant as a watchman during this period, handed to the deputy an Eastern Star ring and another ring which resembled rings owned by Mary Cullen. The defendant had said that Mary was wearing her rings at the time of her disappearance. Some other articles of her jewelry were later found in her button box in the attic. She was supposed to have had about $700 in cash which was never found.

Tests showed traces of blood in the washed rugs in the living room, in the davenport which also had been washed, and in the woodwork above the davenport. A spot in the floor had been sandpapered and blood particles were found between the floorboards. Blood was found on the door jamb of the back door. Mary's raincoat and Boyer's hat showed traces of blood. A pair of cotton gloves purchased for the defendant by the Pattons was later found with blood and sand on the outside. Blood was also found from the knee downward on the right leg and on the upper part of the left leg of a nearly new pair of jeans. A small clot of previously semicoagulated blood was found on the ribbon band of a hat. Blood was also found on the left shoe of a pair of black shoes, on a pair of brown slippers which had been washed, and on an outing flannel sheet.

The officers conducted a continuous river search for the bodies for about a month, and after that at intervals. Evidence as to the probability of recovery from the Colorado River would justify the inference that if Mary and her father had drowned, their bodies would have been recovered.

The defendant was arrested on February 11th, 1949, on a charge of forging the endorsement on Boyer's pension check. He was convicted, and the judgment was affirmed on appeal. (*People* v. *Cullen* (Sept. 18, 1950), 99 Cal.App.2d 468 [221 P.2d 1016].) On him at that time were found photographs of Mary Cullen. On the back of each of two was written in his handwriting: "In Memoriam. My dearly beloved and pre-

cious Mary. Departed from this life January 4, 1949. Rest in peace, Dear One. Born July 17, 1891.'' The writing was in ink except that the figure 4 in ''January 4'' was in pencil. A possible murder charge was mentioned to the defendant. He said they couldn't try him on a murder charge because they didn't have any corpus delicti. Asked what he meant he said: ''You can't prove a man guilty of murder without producing the bodies,' which is the corpus delicti.'' Later, told of the futile river search for the bodies and asked his advice about continuing, he said: ''Well, I wouldn't look for them there anymore. It is just a waste of time because you won't find them there . . . I am not saying they are not in there. I just told you you won't find them there.''

After he was in jail members of the family told him that Mrs. Cullen could not have unlocked the boat because they had found the keys to the boat behind the door where they belonged. He replied, ''Well, Sophie, I will tell you. There is a different story about this whole thing than I have told, but I think I might take it to my grave with me.'' In a conversation between Sophie and Bessie in his presence it was mentioned that a chemist ·found some blood in the house. The defendant said: ''They did not, because I cleaned that house up good four or five times.'' After Sophie left, he said to Bessie: ''Mary, I have got a secret that I might take to my grave.'' She said, ''Ray, I am not Mary. My name is Bessie.'' The next day he told Bessie, ''Mary was prepared to die . . . I baptized her. She was not satisfied with her baptism she had when a girl, and she asked me to baptize her. She was prepared to die Monday.'' Bessie said, ''Ray did you baptize Dad?'' He said, ''You cannot baptize anybody that is dead.'' Asked what he meant, he said: ''Dad was stone dead on the kitchen floor.'' And then, ''Now, if I tell you any more, I am going to jeopardize my defense.'' Asked why Mary did not get a priest for the baptism he replied that she went but the priest was not there; that she didn't go back because she didn't have time. The next day when she brought his rosaries, he asked her not to tell the priest that he had baptized Mary, nor to tell anybody what he would tell her, but that ''Dad and Mary died in the house''; that he was outside and heard two shots; that he found Dad lying dead on the floor and Mary dying in the bathroom with a gun nearby and she asked him to baptize her quick; that nothing could have been done by calling a doctor who would find one with the skull bashed in, one with the arm· broken, shot through the stomach,

and the spine mashed in. He said it would look bad for him with his record and they would file a murder charge against him "but they wouldn't get anywhere, because they had no corpus delicti." Numerous tests from the bathroom area showed no blood reaction. Asked where the bodies were he said that the sheriff's officers and Al and Billy walked right over the evidence of bloody rags and a butcher knife; that if they had gone into the house when they first investigated they would have seen Boyer and Mary lying in there. Asked if Boyer or Mary did the killing he replied that neither of them ever harmed anybody, adding "I can't tell you any more. They have no corpus delicti and if I say anything more to you, I am going to jeopardize my defense." He told them that he buried a jar with Mary's watch, $700 and some papers and that a monk was keeping several thousand dollars for him.

It is unnecessary to detail other inconsistent matters:— The defendant's repetition to the officers that the deaths had occurred in the house; his statement that he hired a man and truck to take the bodies away for $125 and told the boat and river story because of his record; his attempts to bargain for a manslaughter sentence if he told where the bodies were; his statements that he knew where they were, that it would not take long to find them; that he would not plead guilty to a murder charge because he was afraid he would get the death penalty but would consider pleading to second degree; that his only hope was that they had no corpus delicti; that if he told where the bodies were they could hang him for it; "I could have put them in oil drums and hauled them away. I didn't say I did. I said I could have. They can dig up the desert; they can blow up the river, and they will never find them." Toward the end of February 1950, when an officer sought to serve a subpoena, Boyhtari the neighbor was found dead in his cabin with a suicide note beside him dated January 17th.

The defendant took the stand and told the story first related by him and explained or attempted to explain the incriminating details in the foregoing evidence. He testified that he had signed the pension check with Boyer's name at the latter's request and with his authority—a version suggested to him by one of the sheriff's officers. He claimed that he was put through a brutal third degree and that his arms and legs were twisted in an effort to get him to tell where the bodies were. He did not divulge the location of the bodies nor did he confess guilt.

The principal contention is that the corpus delicti, outside of the extrajudicial statements and declarations of the defendant, has not been established; and that the circumstantial evidence is insufficient to prove that Mary Cullen and Daniel Boyer were dead and that their deaths resulted from some criminal agency.

A somewhat similar contention was made by the defendant on his appeal from the forgery conviction and the question was correctly resolved adversely to him. (*People* v. *Cullen, supra,* 99 Cal.App.2d 468, at 472-473.)

Here the corpus delicti consists of two elements, the death of the alleged victims and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially. (*People* v. *Alviso,* 55 Cal. 230; *People* v. *Ives,* 17 Cal.2d 459, 463-464 [110 P.2d 408] and cases cited; *People* v. *Clark,* 70 Cal.App. 531, 544 [233 P. 980].)

It is not necessary in order to support the conviction that the bodies actually be found. In *People* v. *Wilkins,* 158 Cal. 530, 536 [111 P. 612], quoting from 3 Rice on Evidence, 465-466, it was said that to require direct and positive proof of the corpus delicti would be most unreasonable; that the worst crimes are naturally committed at chosen times, in darkness and secrecy; that human tribunals must act upon such indications as the circumstances admit; that more often than not the attendant and surrounding facts remove all mystery and supply that degree of certainty men are daily accustomed to regard as sufficient in the most important concerns of life.

Proof of the corpus delicti does not require identity of the perpetrators. It is not necessary that it connect the defendant with the commission of the crime although it may do so. (*People* v. *Leary,* 28 Cal.2d 740 and 745 [172 P.2d 41] and cases cited.) Nor does motive form any part of the corpus delicti. (*People* v. *Wilson,* 61 Cal.App. 611, 615 [215 P. 565].)

It is the settled rule, however, that the corpus delicti must be established independently of admissions of the defendant. Conviction cannot be had on his extrajudicial admissions or confessions without proof *aliunde* of the corpus delicti; but full proof of the body of the crime, sufficient to convince the jury of its conclusive character, is not necessary before the admissions may be received. A prima facie showing that the alleged victims met death by a criminal agency is all that is required. The defendant's extra-

judicial statements are then admissible, the order of proof being discretionary, and together with the prima facie showing must satisfy the jury beyond a reasonable doubt. (*People* v. *Jones,* 123 Cal. 65 [55 P. 698]; *People* v. *Selby,* 198 Cal. 426, 434-439 [245 P. 426]; *People* v. *McMonigle,* 29 Cal.2d 730, 738-740 [177 P.2d 745]; *People* v. *Mehaffey,* 32 Cal.2d 535, 545 [197 P.2d 12]; *People* v. *Corrales,* 34 Cal.2d 426, 429 [210 P.2d 843].) █ The purpose of the rule is to protect the defendant against the possibility of fabricated testimony which might wrongfully establish the crime and the perpetrator. (*People* v. *Vertrees,* 169 Cal. 404, 409 [146 P. 890]; see, also, *People* v. *De Martini,* 50 Cal.App. 109, 113 [194 P. 506].)

The foregoing summary of the essential facts in the light of the stated principles fully answers the defendant's contentions. █ That the circumstantial evidence must be consistent with guilt and inconsistent with an hypothesis of innocence, and that the proof of the corpus delicti and the identity of the perpetrator must resolve the guilt of the defendant beyond a reasonable doubt, are rules of instruction for the guidance of the jury. █ It is the function of the jury to draw the proper inferences from the proof of the circumstances. █ It is not the province of the reviewing court to overturn the jury's verdict when it is supported by substantial evidence including the reasonable inferences to be drawn therefrom. (*People* v. *Perkins,* 8 Cal.2d 502, 511 [66 P.2d 631]; *People* v. *Newland,* 15 Cal.2d 678, 682 [104 P.2d 778].) █ The circumstances in evidence established a prima facie showing of the corpus delicti sufficient to allow the case, with the defendant's admissions, to go to the jury. The circumstances also pointed to the defendant as the perpetrator and, together with the admissions, unquestionably support the verdicts.

█ There is no merit in the contention that in ruling on the admissibility of the defendant's declarations and statements the court withdrew from the jury the determination as to whether the evidence established the corpus delicti. The objection when first made was argued in the absence of the jury and a ruling then indicated. In ruling on the repeated objection the court stated in the jury's presence the previous conclusion that the prosecution had produced prima facie proof of the corpus delicti to satisfy the legal requirements for admissibility of the defendant's declarations. The court

immediately stated that the weight of the evidence and the ultimate determination was for the jury. It was for the court to determine whether the prima facie showing had been made. If there was error in stating its determination in the jury's presence, the effect was cured by the immediate instruction and subsequent full and proper instructions. In view of the conclusion herein as to the sufficiency of the evidence, no miscarriage of justice resulted even if error on this point be assumed. (*Cf. People* v. *Pokrajac,* 206 Cal. 259 [274 P. 63]; *People* v. *Wilson,* 61 Cal.App. 611, 622-623 [215 P. 565].)

 Prejudice is asserted from the ruling which permitted in evidence the rings handed to the sheriff by Boyhtari in accordance with testimony that they were similar to rings concededly owned and worn by Mary Cullen. It is contended that the evidence fails to establish that they were the identical rings which belonged to her. Similar complaint is made as to other exhibits. Certain and positive identification was not required. The evidence of similarity was sufficient to justify the admission in evidence of the rings and the other objects, the questions of weight and credibility being for the jury. (*People* v. *Ferdinand,* 194 Cal. 555, 563-565 [229 P. 341].)

 Objection is made to the court's ruling refusing a subpoena to produce the bank records regarding the disposition of the proceeds from the sale of Mary's Yucaipa property, or to permit extended cross-examination of William Patton on that subject. The ruling was grounded on the absence of an inference in the evidence that the defendant had benefitted from the sale of the property; therefore that the evidence sought would not relate to a material fact or issue. The defendant does not refer to any testimony in the record and none is discovered which would disclose that the court was mistaken or was in error in its ruling.

 The defendant requested the trial court to appoint a psychiatrist to examine him while under the influence of sodium pentathol and offered proof as to the reliability of the result. The request was denied and an offer of proof rejected. Prejudicial error is asserted. The contention is without merit. It is questionable whether the results of such an examination would be admissible in evidence. (See *People* v. *McNichol,* 100 Cal.App.2d 554, 559 [224 P.2d 21].) And the offer of proof indicated that the statements to be produced would be hearsay, self-serving, and conjectural since the truth thereof would depend entirely on the psychiatrist's

opinion which conceivably might conflict with the opinion of another psychiatrist.

There was no abuse of discretion in denying the motion for change of place of trial or in disallowing the challenge to the jury panel. The motion was submitted on conflicting affidavits from which the court could justifiably conclude that at the time of the ruling and the trial the clamor and prejudice, if any existed, had subsided and that there was no reason why the defendant could not be tried impartially and fairly by the jury selected. It is also to be assumed that the court had some knowledge of conditions existing in the county.

From the defendant's statement at the time of sentence it appeared that prior to August 1949 he had been tried in the county on the murder charge and that the jury had disagreed. The present trial commenced about a year and four months after the disappearance of Mary and her father. There is no showing that people in numbers attended the trial or that a great deal of interest was manifested. In selecting the jury 31 veniremen were examined. Two alternates were selected from eight additional. The defendant did not exhaust his peremptory challenges, having 11 remaining, and declined the court's offer to order a special venire if needed.

The challenge to the jury panel appears to have been based on the assertion that the members did not represent a true cross-section of the citizens of Riverside County, but were taken from a class of substantial citizens eager to serve; also that the jury list was not compiled in accordance with law but was permanent in character except for incidental deletions and additions. No evidence is referred to except the examination of the prospective jurors. That examination does not support the contentions advanced. Some of those drawn were men and women in business and other active work; others were retired; some were wives and others were widows of husbands shown to have been in various walks of life. Fifteen of those examined had had no previous jury experience in California.

It is claimed that one of the two alternates, neither of whom became an active member of the jury, had served on the grand jury the previous year and been discharged in January 1950 without disclosing the fact. Without participation in the verdict no prejudice resulted.

In *People* v. *Yeager,* 194 Cal. 452, 481-482 [229 P. 40], it was stated that a court may not be required to grant a motion

for change of venue because there was some excitement in the county regarding the matter, or that the press had expressed hostility; and that a denial of a change of venue might well be predicated on the fact that the excitement had subsided before the application was made. In that case a much shorter period had intervened between the events and the trial. In *People* v. *Wallace*, 6 Cal.2d 759 [59 P.2d 115], the chief of police of North Sacramento was the victim. The denial of the motion and the renewed motion and the challenge to the jury panel was based upon the trial court's fair appraisal of the jury selected about five weeks after the homicide occurred. As declared in those cases the matters were addressed to the sound discretion of the trial court. Here there is no justification for a conclusion that the court committed an abuse of discretion in denying the motion for a change of venue or in disallowing the challenge to the jury panel.

The record discloses that the defendant had a fair and impartial trial and that the evidence fully supports the verdicts of the jury.

The judgment is affirmed.

Gibson, C. J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

In my opinion the evidence was insufficient to establish the corpus delicti, and the trial court committed prejudicial error in stating in the presence of the jury that the corpus delicti had been established.

I would, therefore, reverse the judgment and remand the case for a new trial.

Appellant's petition for a rehearing was denied August 23, 1951. Carter, J., voted for a rehearing.