483 A.2d 1298

**William Francis HURLEY**

v.

**STATE of Maryland.**

**No. 185, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Nov. 16, 1984.

See also, 59 Md.App. 323, 475 A.2d 518.

540

William T. Wood, Rockville, for appellant.

Diane G. Goldsmith, Asst. Atty. Gen., Baltimore, with whom were Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery County and Eric E. Wright, Asst. State's Atty. for Montgomery County, Rockville, on the brief, for appellee.

Argued before ALPERT and BELL, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

ALPERT, Judge.

The last time anyone saw Catherine Patricia Hurley (nee White) was on Thursday, August 11, 1983, at approximately 6:45 in the evening. The last person to be seen with her at that time was her estranged husband, the appellant, William Francis Hurley. She has disappeared without a trace.

A week after her disappearance, appellant was arrested by the Montgomery County Police Department and charged with first and second degree murder and manslaughter in connection with the disappearance of his wife. He was tried by a jury sitting in Montgomery County (Sanders, J., presiding) and was found guilty of manslaughter. He was

sentenced to ten years incarceration under the jurisdiction of the Division of Correction.

On appeal, Mr. Hurley claims that:

1. There was insufficient evidence of the corpus delecti to support a conviction for manslaughter;

2. He was deprived of his right to a fair and impartial jury;

3. The court erred in refusing to permit him to produce character evidence concerning reputation for truth and veracity; and

4. The court contravened his right to remain silent when it allegedly enhanced his sentence for refusing to disclose the whereabouts of his wife's body.

Perceiving no reversible error, we affirm his conviction and sentencing. In order to discuss the first issue, however, we must set forth in detail the facts in this case as they were developed at trial. The evidence consisted of testimony from a variety of witnesses, appellant's pre-trial statements, exhibits of the victim's personal effects and photographs of appellant's office, as well as stipulations.

## FACTS

Catherine Patricia Hurley married appellant, William Francis Hurley, in 1969. Three children were born unto the marriage—Jack, Danny and Katie. The Hurleys separated in 1981 and Catherine was given custody of the children. Appellant was ordered to pay child support, alimony and the mortgage on the family home at 14601 McClintock Road in Glenwood, Maryland. After the separation and until August 11, 1983 Catherine Hurley lived at this address with the children. At the time of their mother's disappearance, Jack was twelve, Danny was eight, and Katie was five and one-half years old. In 1983 appellant lived in a townhouse in Rockville with his girlfriend, Amy Snively. He was self-employed and owned a janitorial and cleaning business in Rockville, Maryland.

On Thursday, August 11, 1983 Catherine worked for her father, Dr. Merton White, at his office in Silver Spring, Maryland, for several hours. Before leaving work she requested and received her paycheck. She needed the money, she said, because she was taking the children to the beach that weekend. Her son Danny was already there with his grandmother and she was taking Katie with her that night. Jack was to work with his father over the weekend. She left in the company of her daughter, Katie, and appeared to be happy and optimistic.

Catherine left the office that day and went to appellant's townhouse in Rockville. He met her outside and she followed him to his office. They went inside while Katie remained in her mother's car, a Chevrolet station wagon. After a short time, Katie went inside the office to use the bathroom; she then returned to her mother's car. Shortly thereafter, she heard a scream which she believed to be her mother's, so she alighted from the car and peeked in a window where she saw her mother on the floor; however, all she saw were her feet and shoes and a man's feet and shoes. Katie got back in the car and a little later appellant left the office. According to appellant in his pre-trial statement, Catherine allegedly stayed behind to make a phone call. She has never been seen or heard from since that time.

Upon leaving his office, appellant took Katie to his home in Rockville and explained that she would be going to the ocean with him and Jack instead of her mother. He stayed about ten minutes and left. At various times during the investigation, he stated that he left: (1) to return to the office to do paperwork; (2) to check on jobs in the Rockville area; or, (3) to go to his wife's to get more clothes for the children at which time he decided to take her car and put it into "voluntary repossession" with Rockmont Chevrolet, a dealer in Rockville.

Appellant eventually did arrive at the office, where he was met by two employees; one, Johnny Carroll ("Carroll"),

stayed to help him move furniture and straighten up. Carroll then discovered that a tire on appellant's truck was leaking air. After changing the tire, appellant and Carroll left to pick up Jack at Joe White's (Catherine's brother). Appellant, Carroll and Jack returned to appellant's townhouse and went to sleep.

Then, on Friday, August 12, 1983, according to Carroll, he and appellant left the townhouse early in the morning, around 6:00 A.M., to get the flat tire fixed. They stopped at an Exxon Station, but since it had just opened no one was available to fix the tire. They then went to appellant's office to wash the truck since there was a lot of clay-like mud on the front of the truck. Carroll testified that appellant, when asked about the mud, explained that he had been run off the road and the truck was muddy as a result. Appellant, again according to Carroll, then stated he had to go to Rockmont Chevrolet to get a vehicle serviced but that Carroll should try to get the tire fixed at the College Plaza Shell Station and meet him there later. Carroll went to the Shell Station but could not get the tire repaired; he met appellant at the station when he saw appellant walking from the direction of Rockmont Chevrolet. Appellant and Carroll then went to Stidham Tires in Rockville to get the tire fixed and to the Montgomery Donuts to get donuts for the ride to the beach.

According to Hurley's statement to the police, he and Carroll got up Friday morning about 6:45 and went to Stidham Tires to get the tire fixed but that Stidham was not yet open, so he and Carroll waited for them to open. Hurley told police that once they opened he left Carroll at Stidham Tires with the flat and took his truck to Rockmont Chevrolet to move his wife's car inside their gates. He moved her car, got into his car, picked up Carroll at Stidham Tires, stopped for donuts, and returned to the townhouse to pick up Amy, Jack and Katie. He denied ever washing the truck Friday morning.

At trial employees of the Exxon and Shell Service Stations confirmed Carroll's testimony that these stops were, in fact, made, thus contradicting appellant's statement to the police. Also contradicting appellant's statement, Daniel Yeatman, an employee of Stidham Tires, testified that appellant was present the entire time they repaired the tire. Daniel Rigenbach, part owner of Motor Works, Inc., a business located in the same industrial park as appellant's, testified that he saw appellant and Carroll washing appellant's truck Friday morning around 6:30. Rigenbach confirmed Carroll's testimony as to appellant's explanation for the mud on the truck.

After repairing the tire, Carroll and appellant returned to the Rockville townhouse to pick up Jack, Amy and Katie. At the ocean they spent Friday cleaning cottages. On Friday night appellant went to his in-laws' cottage to pick up Danny; when he arrived Mrs. White (Catherine's mother) advised him of Catherine's disappearance and refused to give him Danny.

On Saturday, August 13, 1983, Catherine's father found appellant, Carroll, Jack, Katie and Amy at one of the cottages. He confronted appellant with Catherine's disappearance. Appellant denied any knowledge of her whereabouts. When Dr. White stated that Joe had found Catherine's car at Rockmont Chevrolet, appellant said that he had no idea how it got there but that he did not think that it had been repossessed since he only missed one payment. When appellant returned to the campgrounds where they were staying, he had a message to call the Delaware Police. The police told him to call a Detective Livesay in Howard County, Maryland. Appellant told the Montgomery County police he believed he was to call the detective when he returned to Rockville on Sunday.

On Sunday, August 14th, appellant, Amy, Jack, Katie and Carroll returned to Rockville where they were met by Officer Simmons of the Montgomery County police. Officer Simmons placed a call to the Howard County police for

appellant. He spoke to Detective Livesay and arranged to meet with the detective at his office. He told Detective Livesay and a Montgomery County detective that he last saw Catherine Thursday night at his office where he gave her four hundred ten dollars support money in cash. He told the detectives that he asked her if he could take Jack and Katie to the ocean with him and for an extended vacation and that she consented. He also stated that she stayed behind to make a phone call and that in order to leave he had to move her car. At trial several witnesses testified to seeing Catherine's car at appellant's office on Thursday; they, however, indicated that in order to leave it was not necessary for appellant to move her car.

Before meeting with appellant on the 16th, the Montgomery County police discovered Gary Flemming of Rockmont Chevrolet, who told them that when he arrived at work Friday, August 12, he saw Catherine Hurley's car sitting on the lot and that appellant was sitting in it. Flemming also told the police that appellant had asked him not to say anything about seeing him Friday morning and had called him again on Monday urging him not to say anything about seeing appellant. Flemming testified that appellant told him he was "voluntarily repossessing" the car since his wife was "raping" him financially.

Appellant met again with the police on Tuesday morning at his office; during this meeting Carroll arrived and was separately interviewed. In the middle of this interview, appellant excused himself and spoke to Carroll where he, according to Carroll, told Carroll not to mention seeing Catherine at the office the previous Thursday.

Later that week, on Thursday, August 18th, appellant contacted the police and told them that he had not been honest about Catherine's car.

Finally, on the evening of August 18th, appellant spoke to the police again, this time at the police station. Again he gave them a statement; portions of this statement were played to the jury. In it appellant told the police that in his

first statement he lied about how Catherine's car got to Rockmont Chevrolet. He told them that when he left the townhouse after dropping Katie off, he went to check on jobs. He was also worried about clothes for the children so he went to the McClintock Road address to pick up more clothes. He further stated that when he arrived at the house no one was home; he then decided that he would take Catherine's car to Rockmont and "voluntarily repossess" it since she would not need it because he would have Jack, Katie and Danny. He stated that he then checked to see if his key worked, when it did he moved his car one-half mile down the road and walked back to get her car. He took the car from the driveway and delivered it to Rockmont Chevrolet. He left the car there, went to Montgomery Donuts, and as he was about to call a cab he encountered a man who was going to Olney, Maryland; he hitched a ride with him as far as Georgia Avenue and Route 108. He then walked one block and went to a 7–11 Store to call a cab, whereupon he said he encountered a gentleman going to Westminster who dropped him off at his truck in Glenwood. He then left Glenwood and eventually arrived at the office. He told the police that when he was encountered by his father-in-law on Saturday as to Catherine's whereabouts or as to how the car got to Rockmont Chevrolet, he was intimidated and startled. He offered this as the reason he denied any knowledge of his wife or her car. He also admitted to disposing of the keys to Catherine's car while at the beach because "he just didn't want any part of it." He told them about moving the car on Friday morning before leaving for the beach; however, he never mentioned running into Gary Flemming at Rockmont Chevrolet, and he denied washing his truck Friday morning. When he told of his conversation with Catherine Thursday evening, he referred to it as low-key and one of the best they had ever had; he could not explain the fact that Katie heard a scream.

The State also produced evidence of Catherine's character and reputation. They presented several witnesses who testified to her devotion to her family, to the fact she had

never before disappeared without explanation and to the improbability that she would have left at that time. Furthermore, they provided expert testimony regarding appellant's financial situation which was described as "desperate." Rodger Frankel, an attorney who qualified as an expert on bankruptcy, testified that appellant's budget proposal [1] which made no provision for mortgage, alimony or child support payments was unrealistic and not likely to be accepted by his creditors. Finally, the prosecutor read into the record a stipulation that Catherine Patricia Hurley never cashed the check she received from her father on August 13, nor had there been any activity on her credit cards or bank accounts since that day.

## I.

Appellant contends, initially, that the State failed to produce sufficient evidence of a *corpus delicti* in this case. Appellant correctly states the law when he argues that in a homicide prosecution, there must be proof of a *corpus delicti, i.e.,* proof that the victim is dead and that the death occurred under circumstances which would indicate that it was caused criminally. We said in *Lemons v. State,* 49 Md.App. 467, 433 A.2d 1179 (1981), *cert. denied,* 292 Md. 13 (1981), that:

> In a homicide case the proof of the corpus delicti is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circumstances which would indicate that it was caused criminally by someone.

*Id.* at 473, 433 A.2d 1179 (quoting *Jones v. State,* 188 Md. 263, 272, 52 A.2d 484 (1947)).

Appellant relies on the State's failure to disclose "one shred of evidence as to the presence of [the victim's] body in spite of thousands of man hours of police work," and on the lack of any scientific or forensic proof of foul play.

---

1. Appellant apparently had filed a petition for bankruptcy and was to appear at a hearing in the Bankruptcy Court.

Unfortunately for appellant, the State is not limited to the type of evidence available simply because the instant case is a homicide prosecution. In *Lemons* we noted that our courts had previously indicated that "independent evidence of the *corpus delicti* may be circumstantial in nature when direct evidence is not available," even where the circumstantial evidence applies to the fact of death. *Lemons,* 49 Md.App. at 486, 433 A.2d 1179 (quoting *Miller v. State,* 251 Md. 362, 382, 247 A.2d 530 (1968); *Franklin v. State,* 8 Md.App. 134, 140, 258 A.2d 767 (1969), *cert. denied,* 257 Md. 733 (1970)).

In *Lemons,* we reversed a murder conviction where, as here, the victim's body was never produced. *Lemons* involved corroboration of a confession wherein the appellant confessed to killing a waitress and disposing of her body in ways too gruesome to mention here. Lemons, like appellant herein, argued that there was insufficient proof of the waitress's death or his criminal conduct. We agreed. Unlike the instant case, however, we noted that (1) there was no evidence of "any arguments, threats, or harsh words at any time between appellant and his alleged victim"; (2) that there was no evidence that the victim "disappeared"; and (3) absent an unsuccessful attempt to check with the Social Security administration "the record [was] devoid of any efforts by the state to locate the victim." 49 Md.App. at 487–88, 433 A.2d 1179.

■ Our decision in *Lemons* and here—that failure to recover the victim's body is not fatal to the State's case in a homicide prosecution—is in accord with other states that have addressed a similar situation. As the California Court of Appeals succinctly stated: "The fact that a murderer may successfully dispose of the body of the victim does not entitle him to acquittal. That is one form of success for which society has no reward." *People v. Manson,* 71 Cal.App.3d 1, 139 Cal.Rptr. 275, 298 (1977). We concur with this view and with the admonition espoused by the Appellate Division of New Jersey's Superior Court when it stated

that "successful concealment or destruction of the victim's body should not preclude prosecution of his or her killer where proof of guilt can be established beyond a reasonable doubt." *State v. Zarinsky*, 143 N.J.Super. 35, 362 A.2d 611, 621, *cert. denied*, 75 N.J. 101, 380 A.2d 685 (1976). Numerous other states have affirmed homicide convictions where no body was ever produced, but the evidence proved sufficient for proof of the *corpus delicti*. *See State v. Lewis*, 125 So. 802 (Ala.1930) (eyewitness, bone fragments found, blood splotches and stains and proof that body of deceased burned); *Deering v. State*, 273 Ark. 347, 619 S.W.2d 644 (1981) (State produced evidence of victim's routine, fact that victim last seen talking to someone fitting defendant's description and that defendant attempted to sell car similar to victim's); *People v. Bolinski*, 260 Cal.App.2d 705, 67 Cal.Rptr. 347 (1968) (victim disappeared, defendant arrested with victim's car and credit cards); *People v. Scott*, 176 Cal.App.2d 458, 1 Cal.Rptr. 600 (1960) (statements by defendant that he knew his wife was dead and proof that he had recently cleaned up car); *People v. Cullen*, 37 Cal.2d 614, 234 P.2d 1 (1951) (victim disappeared, proof that defendant forged victim's check, proof of bloodstains on rug and clothing and proof of defendant's incriminating statements); *People v. McMonigle*, 29 Cal.2d 730, 177 P.2d 745 (1947) (testimony of FBI agent recounting defendant's reconstruction of events and other admissions, evidence of victim's shoes and other personal possessions); *State v. Pyle*, 216 Kan. 423, 532 P.2d 1309 (1975) (house burned to ground, no trace of alleged victim); *Warmke v. Commonwealth*, 297 Ky. 649, 180 S.W.2d 872 (1944) (baby dropped in creek, only cap found); *State v. Zarinsky*, 143 N.J.Super. 35, 362 A.2d 611 (1976) (last saw victim drive away with man fitting defendant's description and admissions to cellmates); *State v. Dudley*, 19 Ohio App.2d 14, 249 N.E.2d 536 (1969) (victim's cap found on floor and defendant's car stained with blood as well as a crowbar found stained with blood); *State v. Williams*, 80 P. 655 (Or.1905) (victim disappeared but tufts of victim's hair and metallic articles worn

by victim found); *Commonwealth v. Burns*, 409 Pa. 619, 187 A.2d 552 (1963) (proof of victim's consistent pattern of living and an abrupt termination, victim last seen on floor with blood on forehead and last seen in presence of defendant, defendant confessed to burying victim); *Commonwealth v. Lettrich*, 346 Pa. 497, 31 A.2d 155, 156 (1943) (defendant confessed to murder, no body was ever found, the court noted that fabrication of contradictory statements to divert inquiry was a circumstance indicating guilt); *Commonwealth v. Jones*, 297 Pa. 326, 146 A. 905 (1929) (victim last seen with defendant, burned human bones and victim's clothing found in burned house, victim's clothing also found in defendant's residence); *Epperly v. Commonwealth*, 224 Va. 214, 294 S.E.2d 882 (1982) (evidence of bloodstains and broken ankle bracelet); *State v. Lung*, 70 Wash.2d 365, 423 P.2d 72 (1967) (evidence of coat with bullet hole and bloodstains).

■■■ Appellant also attacks as incredible and unreliable evidence of Catherine's habits and her failure to contact family members and friends. We note, however, that such proof is essential where, as here, no body is produced. *See People v. Cullen*, 37 Cal.2d 614, 234 P.2d 1 (1951); *State v. Zarinsky*, 143 N.J.Super. 35, 362 A.2d 611 (1976); *Commonwealth v. Burns*, 409 Pa. 619, 187 A.2d 552 (1963). *See also Epperly v. Commonwealth*, 224 Va. 214, 294 S.E.2d 882 (1982) wherein the Court stated:

> Worldwide communication and travel today are so facile that a jury may properly take into account the unlikelihood that an absent person, in view of his health, habits, disposition and personal relationships would voluntarily flee, 'go underground,' and remain out of touch with family and friends. The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence.

*Id.* 294 S.E.2d at 890. Especially damaging is the testimony of appellant's five and one-half year old daughter, who

testified to hearing a scream and seeing her mother on the floor. Appellant's counsel at trial and on appeal intimate that this testimony is inherently unreliable because the child's testimony was coached through the use of dolls, reenactments and a "tape of unknown content." We note, however, that these arguments affect only the weight to be given the child's testimony—a matter within the province of the jury.

The test for sufficiency is whether any rational trier of fact, given the evidence, could have found guilt beyond reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830 (1980). In the instant case the State produced evidence of:

(1) the last time Catherine was seen alive by her daughter; she heard a scream and saw her mother on the floor of appellant's office;

(2) the appellant's own inconsistent statements concerning his wife's disappearance, *i.e.*, his inability to account for his activities for several hours the night she disappeared; his persistent denial of washing his truck despite the testimony of two eyewitnesses to the contrary; his involvement in repossessing her car; and his comments to a secretary that certain rugs were seized as a result of the investigation when none were, in fact, taken by police;

(3) Catherine Hurley's relationship with appellant;

(4) her character and patterns of behavior; and

(5) the lack of activity on Catherine's bank accounts and credit cards and lack of contact with family members, friends and governmental agencies.

Given this evidence, as presented, a rational trier of fact could have inferred Catherine's death and the appellant's criminal involvement. The appellant relies on evidence the defense presented at trial which suggested that Catherine Hurley was capable of disappearing without notifying anyone or attempting to contact anyone and which suggested

that she was suicidal and possessed multiple personalities. It is true that this evidence, had the jury believed it, could have given rise to a reasonable doubt. It is obvious, however, from its verdict that the jury did not believe the evidence appellant presented.

Accordingly, we find sufficient evidence to support appellant's manslaughter conviction.

## II.

The second assignment of error calls into question appellant's constitutional right to trial by a fair and impartial jury because the trial court excluded for cause prospective jurors who indicated that absent proof of a body, they could not convict someone of murder or manslaughter. The State argues, in its brief, that this error has not been preserved for appellate review. Notwithstanding appellant's objection each time the court excluded a challenged venireman, the State relies on his pronounced satisfaction with the jury empaneled to argue that any prior objections were waived. The State relies on the Court of Appeals' decisions in *White v. State*, 300 Md. 719, 481 A.2d 201 (1984); *Calhoun v. State*, 297 Md. 563, 468 A.2d 45 (1983); *cert. denied*, —— U.S. ——, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); *Glover, Robinson and Gilmore v. State*, 273 Md. 448, 330 A.2d 201 (1975) and *Neusbaum v. State*, 156 Md. 149, 143 A. 872 (1928).

The Court held in *Neusbaum* that the defendant had waived his objection to the State's Attorney's improper remarks before the prospective jurors when he accepted the jury as empaneled. The Court, noting the impropriety of the remarks, found no reversible error in light of the defendant's acceptance of the jury, indicating that the defendant acknowledged he suffered no injury.

In *Glover*, there was a shortage of prospective jurors. The trial court instructed the sheriff's office to empanel 25 additional veniremen. When defense counsel discovered that the sheriff had not consulted the voter registration

lists, he objected. The court overruled the objection and a jury was empaneled after which defendants expressly stated their satisfaction with the jury. The Court of Appeals held that "by approving the jury actually selected they waived their prior objection to the panel of talesmen." 273 Md. at 453, 330 A.2d 201.

The trial court in *Calhoun* overruled a challenge for cause and the defendant exercised a peremptory challenge to exclude the challenged juror. The defendant argued that because of the necessity to exercise a peremptory challenge to exclude the unwanted juror he was, in effect, given only nineteen challenges instead of twenty. The Court of Appeals, relying on *Glover*, held that the defendant's express satisfaction with the jury as selected waived any prior objection.

In *White*, the Court's most recent discussion of the issue, a trial court again overruled a challenge for cause to a prospective juror and the defendant was forced to exercise a peremptory challenge. The Court noted that since the defendant had not exhausted his peremptory challenges, there was no reversible error and, in any event, the objection had been waived because the defendant expressed qualified satisfaction with the jury as empaneled. The Court, however, did state that:

> before the jury was sworn, the court invited objections to the proceeding by which the jury was empaneled. Defense counsel told the court he had none. He further told the court that his 'only objection' related to the *exclusion* of a prospective juror for cause, even though the court had pointed out that objections to excusing or failing to excuse a juror were already on the record, and, in effect, need not be repeated.

*White*, 300 Md. at 731, 481 A.2d 201 (emphasis supplied). *See also Thomas v. State*, 301 Md. 294, 483 A.2d 6 (1984).

In the instant case the court excluded a prospective juror over appellant's objection. A careful reading of *White* indicates that the Court of Appeals never addressed the

opposite jury selection issue which is apposite to the issue raised here, *i.e.*, exclusion of a desired juror as opposed to refusal to exclude an undesirable juror. Assuming arguendo that the alleged error was preserved for review, we hold that there was no error in the jury selection process.

The issue of improper jury selection based on the exclusion of prospective jurors who indicated that absent proof of a body, they could not convict someone of murder or manslaughter, arose in the context of exchanges between the court and jurors number 147, 166, 169 and 99–A.

Juror # 147 unequivocally indicated that he "would not be able to convict someone unless a body was produced."

The position of Juror # 166 was much the same. "[She] would find it very difficult to convict someone when there is no body unless the circumstantial evidence were overwhelming."

Similarly, Juror # 169 indicated that she could never be convinced the person was dead unless the body was produced.

Finally, Juror # 99–A indicated that there was but one circumstance where he could convict without production of a body, *i.e.*, "... where if there were some witnesses who said, 'Yes, I saw him pull the trigger or stick the knife in or something.' "

■ Clearly, appellant is entitled to a fair and impartial jury. Article 21 of Maryland's Declaration of Rights guarantees a defendant's right to an impartial jury. Md.Decl. of Rights, Art. 21. *See Couser v. State*, 282 Md. 125, 383 A.2d 389, *cert. denied*, 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978). Our courts have had numerous opportunities to consider what this guarantee entails. *See Calhoun v. State*, 297 Md. 563, 468 A.2d 45 (1983); *Couser v. State*, 282 Md. 125, 383 A.2d 389 (1978); *Bristow v. State*, 242 Md. 283, 219 A.2d 33 (1966); *Kujawa v. Balto. Transit Co.*, 224 Md. 195, 167 A.2d 96 (1961); *Grammer v. State*, 203 Md. 200, 100 A.2d 257 (1953), *cert. denied*, 347 U.S. 938, 74 S.Ct.

634, 98 L.Ed. 1088 (1954); *Garlitz v. State,* 71 Md. 293, 18 A. 39 (1889).

The *Calhoun* Court noted that despite his recent encounters with victims of crime, the challenged juror nonetheless indicated that if he was not satisfied with the defendant's guilt, he could vote for acquittal. It overruled the challenge and stated:

> [I]n our present state of society, all that can be required of a juror, to render him competent, is, that he shall be without bias or prejudice for or against the accused, and that his mind is free to hear and impartially consider the evidence, and to render a verdict thereon without regard to any former opinion or impression existing in his mind, formed upon rumor or newspaper reports. Whenever it is shown that such is the state of mind of the juror, he should be held to be competent; and such is the rule as laid down by this court in *Waters v. State,* 51 Md. 430 (1879). In that case it was said 'that the opinion which should exclude a juror must be a fixed and deliberate one, partaking in fact of the nature of the pre-judgment.'

*Calhoun,* 297 Md. at 562, 468 A.2d 45 (quoting *Garlitz v. State,* 71 Md. 293, 299–300 (1889)). *See also United States v. Thompson,* 744 F.2d 1065 (4th Cir.1984).

A review of the record in the instant case indicates that the trial court made every effort to discern which jurors could or could not lay aside any impressions or opinions they had regarding the proof necessary for a conviction. These jurors were not unequivocal in their response to the court's questions, their responses were negative, they could not convict absent proof of the body.

Appellant was not entitled to jurors who have opinions that are irreconcilable with the open-mindedness that impartiality requires. Those jurors excluded indicated to the trial court that they were of such a state of mind that open-mindedness and, consequently, impartiality, was out of the question. Accordingly, there appears to be no error in the exclusion of these jurors for cause.

### III.

Appellant next argues that the trial court improperly denied him the opportunity to present character evidence of his reputation for truth and veracity. While the court did refuse to permit such testimony, we see no error in that decision.

The record discloses that appellant was permitted to introduce character evidence as to his reputation for peace and good order; the court's refusal concerned only evidence of his reputation for truthfulness.

Character evidence is only permissible when relevant. Wharton's *Criminal Evidence*, § 229 (13th ed. 1972). A defendant's reputation for *peace and good order* is relevant where a crime of violence is at issue. Ordinarily, however, one's reputation for *truth and veracity* is not relevant in a murder prosecution. *See Grant v. State*, 55 Md.App. 1, 36 n. 3, 461 A.2d 524 (1983) (quoting *Braxton v. State*, 11 Md.App. 435, 450 n. 3, 274 A.2d 647, *cert. denied*, 262 Md. 745 (1971)). While appellant concedes that this is ordinarily true, he contends that in his cause this evidence was relevant because the State put his credibility at issue in its case in chief. He points to the State's reliance on the alleged inconsistencies in his statement as impugning his credibility, thereby making it relevant. This argument has no merit.

This Court has previously addressed situations similar to appellant's where character evidence was at issue. In *Braxton*, where the defendant was charged with robbery and elected to testify, the alleged error was the trial court's refusal to instruct the jury as to character evidence. The Court distinguished between two types of character evidence: (1) credibility, which applies to any *witness*, including the defendant; and (2) the defendant's reputation for a particular trait relevant to the crime charged. The latter may be introduced regardless of whether the defendant elects to testify. *Braxton*, 11 Md.App. at 439, 274 A.2d 647.

■ Later in *Hallengren v. State*, 14 Md.App. 43, 286
A.2d 213 (1972) the defendant was convicted of causing a
disturbance, use of obscenities in a public street and disor-
derly conduct. Hallengren also requested a jury instruction
on character evidence. Again, noting that there were dif-
ferent types of character evidence, this Court held that
one's character for truth and veracity was "not relevant to
demonstrate that it was unlikely that [Hallengren] would
commit the crimes with which he was charged." *Id.* at 49,
286 A.2d 213. The Court then noted:

> A good reputation for truth and veracity is a character
> trait relevant to credibility, and we think it plain from the
> record that appellant's only purpose in offering such
> testimony was to support or bolster his own credibility as
> a witness in order to convince the jury that he, and not
> the police, should be believed.

*Id.* We observe, however, that evidence of truthfulness and
veracity is not relevant where, as in the instant case, it did
not involve a character trait indigenous to the crime
charged and where appellant elected not to testify.

Our decision in *Grant v. State*, 55 Md.App. 1, 461 A.2d
524 (1983), wherein we again addressed the distinction be-
tween the types of character evidence, is fatal to appellant's
cause. Grant's crime was drug trafficking. He, like appel-
lant herein, gave inconsistent statements to police and elect-
ed not to testify. Also, like appellant, he attempted to offer
evidence of his reputation for truthfulness which the court
declined to accept. On appeal, this Court noted the previ-
ous distinctions made between the different types of charac-
ter evidence. *Id.* at 35, 461 A.2d 524. The Court then
found no error in refusing to admit the evidence inasmuch
as defendant's reputation for truthfulness was irrelevant
and not at issue. *Id.* at 39, 461 A.2d 524.

The above cases indicate the clear distinction between the
various types of character evidence. Appellant was limited
in the types available to him since he elected not to testify
and, consequently, did not put his credibility at issue. Ac-

cordingly, there was no error in refusing to admit the evidence.

## IV.

Finally, appellant contends that the "trial court contravened [his] constitutional right to remain silent in enhancing the sentence imposed due to the alleged refusal of appellant to disclose the whereabouts of the body of the alleged deceased."

He argues that the trial court's comments at sentencing indicated that he had been given a harsher sentence because no body was ever found. He points to the fact that the sentencing guidelines called for a maximum of four years incarceration, and argues that he received a term of ten years indicative of the court penalizing him for remaining silent.

Appellant raises this challenge for the first time on appeal; no objection was made to the trial judge's comments at sentencing. Ordinarily, we would dispense with this issue under Maryland Rule 1085; however, in an effort to avoid further litigation in this matter, we will address the substance of appellant's claims of error.

At sentencing, Judge Sanders made the following comments:

All right. I think everyone recognizes that we are here today accepting the jury's finding after having heard extensive testimony in this case. They found first, obviously, that Mrs. Hurley is deceased. They found that she died at your hand and they also found that it was not an intentional killing. That is the only way that I can interpret their verdict.

Now, I accept it. I am somewhat at a disadvantage. It is usual in sentencing procedures that the Court has before it all of the facts and all of the circumstances. So that it might properly take into account these matters in arriving at what would be an appropriate sentence. And

I am at a disadvantage because no one knows what circumstances led up to the killing.

The guidelines that have been referred to call for a maximum of four year sentence and they are based upon a history of sentencing in manslaughter cases. And the reason for what might appear to be, considering that a death is involved, might appear to be a light maximum sentence is because most manslaughter cases are accompanied by mitigating circumstances. Whether it be a provocation on the part of the decedent, whether it be simply an accidental blow which resulted in the death, whether it be as a result of consumption of alcohol and the driving of a vehicle in an improper manner.

And, it is for that reason and the Court having imposed these sentences which form the basis for the guidelines, having taken these matters into account. And this Court does not have the advantage of any of that. The Court has no evidence whatever of any mitigation or any explanation of the taking of this life. Looking at it the other way, the Court has some aggravating circumstances. The most obvious and the most aggravating is a total lack of any knowledge as to what may have happened to the decedent. So, it is difficult at best, it is always difficult to impose a sentence, but it is most difficult in this case because, one, the enormity of the offense, the result and the total absence of any explanation as to why it may have occurred.

Now, it is not unusual for the Court to receive letters before sentence and the Court has received many such letters in this case. I suppose I have received more correspondence in this case than I have ever in some 14 years received. Most of them come from your friends and supporters and family. And I read everyone of them. And there is a common theme in there, they all suggest to the Court in all honesty, obviously, that you are a decent person, a hard working person, that you have been devoted to your family, that you have been helpful to others, that you have been active in your community and that

you have, almost never at least, displayed to them any characteristics which would indicate that you would be capable of committing an act such as this.

 * * * * * *

I received other letters, not as many in number, mostly from the family of Mrs. Hurley. And they relate in these letters the utter devastation that has resulted from her death. Not only from her death, which of course is a natural thing, but the circumstances of her death. They are obviously from the heart. They have been so affected that there is nothing the Court can do or you can do really to relieve them of the anxiety and of the grief that they feel.

Again, there is a common theme and that is they accept the death, but they have been deprived of what most families have, at least upon the death, is a burial. And there is a termination and an acceptance of the status and a determination then to go on. And they have not reached that point. And the reason that they express that they have not reached that point is because they have not had a burial. They are a very religious family obviously and it is of extreme importance to them.

 * * * * * *

But, I have this big problem, Mr. Hurley and that is I have no reason to consider a lesser than a maximum sentence that the Court allows—that the law allows. I have a death, I have the absence of a body, if I accept the jury's verdict, which I do, I have to conclude that you in some manner disposed of the body or secreted it. And, I must say had that not occurred or even understandably having occurred, that there was some action or some movement on your part to reveal the circumstances and to reveal the location of the body, that would obviously have an impact and it would be something that the Court might consider.

Your immediate denial and your continued denial is understandable, that is a natural reaction. The attempt

to cover up is understandable, that is a natural reaction. But, there comes a point when we must as human beings accept a situation and attempt, as best we can, to come back and to rehabilitate it. And I feel that you have not reached that point. And for that reason, the Court can not consider that.

So, notwithstanding the guidelines, which the Court is bound to follow unless it has some reason not to do so, I feel that the four year maximum called for under these guidelines, under these circumstances, is inappropriate. The Court then, in accordance with the statutory provisions with respect to manslaughter will impose a sentence of 10 years to the Division of Corrections.

 Appellant points to these comments and reasons that the court "imposed the maximum sentence of ten years because [he] failed to reveal the alleged whereabouts of his wife's body." Appellant, however, misunderstands the court's comments. It is true that the sentencing guidelines suggested a four-year maximum. The guidelines, however, are not mandatory. "Nothing in the law requires that [the] Guidelines' sentences or principles be applied; they *complement rather than replace* the exercise of discretion by the trial judge." *Teasley v. State,* 298 Md. 364, 370, 470 A.2d 337 (1984) (emphasis added). In the event trial judges choose not to follow the Guidelines, it is merely requested that they explain their reasons for not following them. We view Judge Sanders' comments as his explanation for not following the suggested four-year sentence.

 Once he decided not to follow the guidelines, Judge Sanders had broad discretion in assessing what to consider in determining appellant's sentence. As the Court of Appeals said in *Henry v. State,* 273 Md. 131, 328 A.2d 293 (1974):

The scope of a sentencing judge's inquiry in imposing sentence is sufficiently broad to permit him to consider information concerning the convicted person's background and other relevant matters, such as the gravity of

the offense for which the person was convicted.... However, in assessing such factors as the background of the individual and the gravity of the offense, sentencing judges are permitted to consider reliable evidence of conduct which may be opprobrious although not criminal, as well as the details and circumstances of criminal conduct for which the person has not been tried.

*Id.* at 146–47, 328 A.2d 293 (quoting *Henry v. State*, 20 Md.App. 296, 314–15, 315 A.2d 797 (1974) (J. Davidson dissenting)).

■ In assessing the gravity of the offense, a proper consideration is the effect the crime has had upon the victims. Maryland law, in fact, requires the court to make this consideration prior to sentencing. Md.Code Ann. art. 41 § 124(c) (1957, 1982 Repl.Vol., 1984 Supp.). The victims in this case are appellant's and Catherine's children, who lost both a mother and a father because of appellant's conduct; and Catherine's parents and brother and sisters, who lost their eldest daughter and sister, and who have been denied the opportunity to give Catherine a decent burial—again, because of appellant's conduct. The record in this case contains no less than one letter from each member of the White family indicating their desire to give Catherine a proper burial and the accompanying lack of finality because their desire remains unfulfilled as a result of appellant's conduct.

■ We do not find in Judge Sanders' comments anything which indicates an improper consideration in determining the sentence. The court did not weigh against defendant his election to stand trial rather than plead guilty, nor did it negatively consider appellant's protestations of innocence. *See Johnson v. State*, 274 Md. 536, 336 A.2d 113 (1975) (election to stand trial); *Herbert v. State,* 31 Md.App. 48, 354 A.2d 449 (1976) (protestations of innocence). What the court did consider was the overwhelming impact this tragedy has had upon the members of Catherine's family. We cannot say that this was an impermissible consideration.

*See Sandvik v. State,* 564 P.2d 20, 23 (Alas.1977) ("Generally the victims of antisocial conduct should be considered in the sentencing process."); *Bish v. State,* 421 N.E.2d 608, 618 (Ind.1981) ("Unquestionably these factors were properly considered by the trial court.")

We recognize that if the court did, as appellant suggests, impose a more severe sentence because he elected to remain silent, that there would be cause for remand. *See Johnson v. State,* 274 Md. 536, 336 A.2d 113 (1975). We note, however, that the court's comments are to be read in full context; isolation of a particular passage serves no purpose. *Henry v. State,* 20 Md.App. 296, 305, 315 A.2d 797, *aff'd,* 273 Md. 131, 328 A.2d 293 (1979). As we review the court's comments in their entirety, we do not find the impermissible considerations suggested by *Johnson* or *Herbert;* we find only the court's recognition that appellant's conduct continues to cause the victims of his crime to suffer. Such recognition and consideration is not improper.

Accordingly, since the court adequately explained its reasons for not following the sentencing guidelines and since it did not take into account any impermissible consideration in assessing appellant's sentence, we affirm.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.