OPINION OF THE COURT
Meyer, J.
The proscription of CPL 60.50 against conviction solely upon evidence of a confession or admission without proof *563 that the offense charged has been committed does not require direct proof, other than the confession or admission, of death or criminal agency. Although the body of the victim is never found and there is no direct evidence, other than the confession, that the defendant caused the victim’s death, a jury question is presented by circumstantial evidence calculated to suggest that the victim is dead and implicating defendant as the criminal agency, the key to which is furnished by the confession or admission. The order of the Appellate Division should, therefore, be reversed and the verdict should be reinstated.
I
The question at issue being the sufficiency of the evidence to sustain the jury’s verdict finding defendant guilty of murder in the second degree, the evidence is to be viewed in the light most favorable to the People. What follows is a recital of the evidence as so viewed.
Mary Robinson, a lifelong resident of Rochester, was last heard from at 1:30 a.m. on June 10,1976. Married to Larry Robinson in October, 1971, she had worked as a telephone solicitor for about a year and then as a waitress until, following her father’s death in 1974, she inherited an interest in seven houses. Thereafter she collected the rents and took care of the maintenance of the houses. For about a year and a half before her- father’s death, Mary’s sister, Frances, lived with Mary and her husband. In 1973, Larry Robinson began living as husband and wife with Frances and told Mary he did not wish to continue such a relationship with her. Mary, nevertheless, remained in the same living quarters with Larry and Frances. In early June, 1976, Larry and Frances began working at a massage parlor and in order to be closer to where they worked moved from the apartment in which the three of them were then living to a hotel. Frances was working as a prostitute. Mary, who had again been working as a waitress, was told by Frances and Larry what they were doing and she also started in early June, 1976, working as a prostitute, mainly at several downtown Rochester hotels. Although she had remained in the apartment in order to close it up, she was going to move in with Frances and Larry when *564 that was done. Larry testified that he was in daily contact with her and that her emotional and physical condition was good.
Between 6 and 7 p.m. on June 9, 1976, Larry received a call from Mary and at 8:30 p.m., he and Frances met and spoke with Mary in the park near the two hotels she frequented. She was wearing her glasses, a dress, a light jacket and white sandals and was carrying a white purse. Larry and Frances then returned to their hotel room. At 1:30 a.m. on June 10, Larry had a 5 to 10 minute telephone conversation with Mary. When he had not heard further from her by about 3 a.m., he and Frances went looking for Mary, checking with the security guards at the two hotels. When she had neither called nor come to their hotel by 7:30 a.m., Larry and Frances went to the apartment. They found no one there but found nothing missing from it other than the glasses and clothing she wore, the purse she carried when they met in the park the night before and the reddish plaid wallet she carried in her purse. Mary’s mother had died giving birth to her and the wedding picture of her mother and father which she always kept at her bedside was in its regular place on the nightstand in her bedroom. Larry and Frances remained at the apartment until 11 a.m. the next day, June 11, and then reported Mary to the police as a missing person. Neither Larry nor Frances, nor Mary’s sister-in-law and mother-in-law, all of whom saw her frequently before June 9, have had any contact with her since, nor was any money paid into her Social Security account after the quarter ending in June, 1976, nor any claim for benefits made against the account.
Defendant Lipsky was an accounting student at Monroe Community College in Rochester in 1976, and was living in an apartment at 77 Brooks Avenue. In April, 1976, he became engaged to Marsha Hanrahan and when the gas and electricity was turned off at 77 Brooks Avenue, he moved into her apartment. On June 1,1976, Ms. Hanrahan left Rochester for Cape Cod where she stayed until June 14 or 15. Her relationship with defendant was not going well when she left. When she returned to Rochester, defendant was at her apartment but seemed upset and emotionally *565 overwrought, and at times cried. He told her he wanted to go to Arizona and work at his parents’ motel and asked her to come. Shortly thereafter he left. Ms. Hanrahan did not go with him, but she did go to the 77 Brooks Avenue apartment to help him clean it up, pack the things he wanted to take and discard the things he did not want. While doing so she found in a cupboard in the room across the hall from defendant’s room a purse, some white sandals and some girls’ socks. Inside the purse was a pair of wire frame glasses and a red plaid wallet in which was a police identification card bearing a photograph and the name of Mary C. Robinson and some family pictures. She asked defendant whose the articles were and he replied that they belonged to a former tenant and had been abandoned. He told her she could keep them, which she did, asking a number of friends whether they had ever seen the girl identified by the police card. Defendant left Rochester for Arizona a few days later.
In August, 1978, defendant, who had married in the interim, was working in Provo, Utah, for a distribution company. On October 16,1978, as the result of an incident that occurred on the campus of Brigham Young University, defendant was arrested for aggravated assault. He pleaded guilty and was ordered held pending presentence evaluation. During a conference with the psychiatric social worker in January, 1979, defendant told him that he had committed a previous crime which he wished to clear up. Warned that his statements could not be kept confidential and after discussing the matter with his wife, defendant met with the social worker and his probation officer on February 7, 1979, and informed them that he had murdered a woman, that she was a prostitute whom he had paid to have intercourse with him, but that he became angry when she wanted to leave and attacked her and then strangled her for fear that someone in her family might retaliate against him. Questioned as to the name, date and place, he wrote on a legal pad: “Mary Robinson, June 14, 1976, Rochester, N.Y.”, and gave the place in Rochester as his apartment at 77 Brooks Avenue. Asked what he had done with the body, defendant said he had placed it in the *566 trunk of his car and driven three hours to a point south of Rochester, where he dumped the body down a gully.
After the Rochester police were notified by Utah authorities, the Rochester Democrat and Chronicle carried an article on the matter including a photograph of Mary C. Robinson. As a result Ms. Hanrahan turned over to the Rochester police the articles defendant had given her when his apartment was cleaned out, all of which were introduced at trial and identified by Larry Robinson as belonging to Mary Robinson. The People also presented testimony of two of defendant’s co-workers at the Provo distribution company that on separate occasions defendant.had stated that he could not join the Mormon church because he had killed someone. The first, who testified to a conversation at the warehouse, asked defendant what was the reason, to which defendant responded that he was afraid he would be caught and so, though he considered backing out, had gone through with it. The second, who testified to a conversation at his own apartment, asked why he was being told about such things, to which defendant responded: “well, go ahead and try to pin it on me, you can’t because there isn’t a body so there wouldn’t be any evidence.”
Also introduced was a poem written by defendant, found during a consensual search of defendant’s apartment by the Utah police after the October 16, 1978 arrest, which read (punctuation added):
“To crush out a life with a hand or a heel;
“To be carelessly senseless and not even feel;
“To treat one as nothing and not even real;
“To be as a jackal, a thief who did steal.
“I was such a man, and it’s a part of me now.
“I was such a fool and can’t even tell how I did such a thing;
“Now, it weighs on my brow and I think of the peace such an act won’t allow.
“But still I live on and remember it well.
“Yet still I must live to remember the hell.
“I can never let go of the body that fell, and it tears me to pieces where my thoughts on this dwell.
*567 “I can never be free of this feeling inside.
“I will never be able to successfully hide.
“And there is no way to share the tears that I’ve cried.
“So I now live for two; by my hand one has died.”
In addition to the confession and admissions, the People’s case included testimony of defendant’s former roommates at 77 Brooks Avenue, that they had never met Mary Robinson or seen the articles found by Ms. Hanrahan; of defendant’s landlord at that address, who testified Mary Robinson had never been a tenant there, that he cleaned out the apartment before defendant moved in and did not see those articles and that though defendant was obligated to give him a month’s notice prior to moving he gave only a week to 10 days’ notice; of several witnesses that Mary Robinson wore the wire frame glasses all the time and could not see well without them; and of unsuccessful efforts of the New York and Pennsylvania police to locate Mary Robinson’s body.
Prior to trial, defendant’s attorney moved to suppress his February 7 confession to the Provo, Utah, authorities. The motion was denied, the Trial Judge finding the confession completely voluntary and made in a knowing and reflective manner. No issue as to that ruling is involved on this appeal. When defendant thereafter moved for a trial order of dismissal at the close of the evidence, the Trial Judge reserved decision and the jury returned a verdict of guilty. Defendant then moved for judgment notwithstanding the verdict on the ground that there was no evidence other than defendant’s confession and admissions to establish either Mary Robinson’s death or any criminal act of defendant in relation to her. The Trial Judge reluctantly agreed after reviewing the trial transcript that there was neither direct proof of death nor proof that death was caused by a criminal act. He therefore dismissed the indictment.
The Appellate Division affirmed by a divided court. Two Judges writing for affirmance agreed with the Trial Judge that the requirement of CPL 60.50 had not been met, that section requiring either “direct proof of one or the other of the element of the corpus delicti or, in the absence of such proof, that the circumstantial evidence of the corpus delicti *568 be ‘strong and unequivocal’ ” (84 AD2d, at p 50). They held CPL 60.50 to incorporate the requirement of Ruloff v People (18 NY 179, 192) that there be direct evidence of death when no body has been found and did not find in the Legislature’s failure to re-enact as part of the Criminal Procedure Law former section 1041 of the Penal Law (codifying the Ruloff rule) any indication of intention to lessen the proof required to convict. The Presiding Justice concurring disagreed as to the effect of the failure to reenact former section 1041 of the Penal Law, but found the evidence nevertheless insufficient. The two dissenters would have held the Ruloff rule abandoned and the circumstantial evidence sufficient, when considered in connection with the confession, to meet the requirements of the CPL. We agree with that conclusion and, therefore, reverse.
II
This case involves two related but distinct rules which are often confused.
A.
The first is the common-law rule enunciated in Ruloff v People (18 NY 179, 184, supra) that a defendant cannot be convicted of murder “without direct proof of the death, or of the violence or other act of the defendant which is alleged to have produced death.” Although the rule has often been said to preclude conviction for murder unless the body has been found, that is an oversimplification.[1] Exceptions were recognized “ ‘as where the murder has been on the high seas, at a great distance from the shore, and the body had been thrown overboard, or where the body had been entirely consumed by fire, or so far that it was impossible to identify it’ ” (Ruloff supra, at p 188), in which case direct evidence of death and accounting for the absence of the body would suffice (ibid., at p 193). Moreover, the rule required no more than direct proof (ibid., at pp 193-196), which would, of course, include eyewitness testimony.
The rule was said to be “‘warranted by melancholy experience of the conviction and execution of supposed *569 offenders, charged with the murder of persons who survived their alleged murderers’ ” (Ruloff, at p 194). It was “regarded as part of the humane policy of the common law, which affirms that it is better that many guilty should escape than that one innocent should suffer; and * * * it may have its probable foundation in the idea that where direct proof is absent as to both the fact of death and of criminal violence capable of producing death, no evidence can rise to the degree of moral certainty that the individual is dead by criminal intervention, or even lead by direct inference to those results” (ibid., at p 184).
First declared in Ruloff in 1858, the rule was incorporated into the Penal Code (§ 181) by chapter 384 of the Laws of 1882,[2] and ultimately became section 1041 of the Penal Law of 1909. The statute was, however, narrowly construed, lest it open “a door of escape to that brutal courage which can mangle and burn the lifeless body” (People v Palmer, 109 NY 110, 112; see, also, People v Jennings, 40 AD2d 357, 362 [“the defendant should not be shielded * * * through the concealment of the body and its decomposition”], affd on opn at App Div 33 NY2d 880). In this century the rule, whether in its common-law or statutory form, has been widely criticized as one which rewards the professional or meticulous killer. It was not carried forward into the Penal Law of 1965 and remains the law in but a small minority of jurisdictions. We do not pause to consider whether the common-law precedent survives the enactment of the 1965 Penal Law revision, for even if that hypothesis could be sustained, the Ruloff rule is so clearly out of harmony with the general rule that the corpus delicti may be established by circumstantial evidence that we have no hesitancy in overruling it.
B.
The second is the confession-corroboration rule, also first declared as common-law precedent (People v Hennessey, 15 Wend 147; People v Badgley, 16 Wend 53; see Millstein, Confession Corroboration in New York: A Replacement for *570 the Corpus Delicti Rule, 46 Fordham L Rev 1205, 1220), then incorporated in the 1881 Code of Criminal Procedure as section 395 and in 1970 carried forward into the present Criminal Procedure Law as section 60.50. That section proscribes conviction “of any offense solely upon evidence of a confession or admission made by him [the defendant] without additional proof that the offense charged has been committed.” The purpose sought to be served by its provision is “to avert The danger that a crime may be confessed when [in fact] no such crime * * * has been committed by any one’ ” (People v Reade, 13 NY2d 42, 45, quoting from People v Lytton, 257 NY 310, 314). It is said to have stemmed from a general distrust of extrajudicial confessions, which might be erroneously reported or construed, involuntary, mistaken or the workings of a disturbed or insane mind, as well as from rare but widely reported cases in which after conviction of the defendant his “victim” returned alive (People v Murray, 40 NY2d 327, 331-332, cert den 430 US 948).
C.
Thus, though the two rules shared as common background the fear of convicting the innocent, the now-defunct Ruloff role required no more than direct proof of death, and would have been satisfied by a defendant’s confession or admission, either of which constitutes direct eyewitness testimony of the defendant himself (People v Licitra, 47 NY2d 554, 559; see People v Bretagna, 298 NY 323, 326, cert den 336 US 919; Millstein, op. cit., p 1208, n 25).[3] What remains, then, when there is a confession or admission, is only CPL 60.50’s requirement of “additional proof that the offense charged has been committed,” that is to say, that there be some evidence apart from defendant’s confession or admission, to establish that fact.
It is not enough that the additional proof partially corroborates the truthfulness of the confession (People v Cuozzo, 292 NY 85, 93; see People v Jennings, 40 AD2d, at p 361, n 3). The confession may, however, “be used as a key *571 or clue to the explanation of circumstances, which, when so explained, establish the criminal act” (People v Cuozzo, supra, at p 92).
Under CPL 60.50 no additional proof need connect the defendant with the crime (People v Murray, 40 NY2d 327, 332, supra; see People v Daniels, 37 NY2d 624, 629; Richardson, Evidence [Prince, 10 ed], § 553; Fisch, New York Evidence [2d ed], § 873).[4] Evidence in addition to the confession is, moreover, sufficient “even though it fails to exclude every reasonable hypothesis save that of guilt” (People v Cuozzo, 292 NY 85, 92, supra). Indeed, the statute is satisfied “by the production of some proof, of whatever weight, that a crime was committed by someone” (see People v Daniels, 37 NY2d 624, 629, supra), and conduct of defendant indicating a consciousness of guilt, such as presence at the scene, proof of motive or flight, may “be held to constitute the essential additional proof” (People v Reade, 13 NY2d 42, 46, supra). In final analysis, of course', the additional evidence of the crime together with the confession must be sufficient to establish defendant’s guilt beyond a reasonable doubt (People v Conroy, 287 NY 201, 202), but “‘when, in addition to the confession, there is proof of circumstances which, although they may have an innocent construction, are nevertheless calculated to suggest the commission of crime,.and for the explanation of which the confession furnishes the key, the case cannot be taken from the jury for a non-compliance with the requirement of the statute’ ” (People v Reade, supra, at p 45, quoting from People v Jaehne, 103 NY 182, 199-200).
Ill
Measured against that template, the evidence was sufficient to present a question for the jury, notwithstanding that Mary Robinson’s body has not been found and that, apart from defendant’s confession and admissions, there was no direct proof of death or of criminal agency.
*572 The circumstances of Mary Robinson’s disappearance not only meet Reade’s “calculated to suggest” standard, they are strongly suggestive of the commission of crime, for the evidence is wholly inconsistent with the possibility that she left Rochester of her own free will. Since the early morning hours of June 10, 1976, she has never been heard from. She was a lifelong resident of Rochester, the owner of property in that city, and had strong social ties in the community. That nothing but the articles she wore or carried on June 9 were missing from her apartment, that her glasses, which she regularly wore, purse, wallet and shoes were not with her but in defendant’s possession, and that the family picture she treasured was still on her night table provide sufficient evidence that she did not intentionally leave Rochester. Indeed, the fact that she had communicated three times during the evening of June 9 and early morning of June 10 with her husband, who expected to hear further from her, is inconsistent with an intent on her part to leave. Of some significance also in view of the fact that she had worked in several legitimate positions is the total absence of any activity in her Social Security account after her disappearance, although the fact that she had become a prostitute just before she disappeared reduces the weight that can be given to that factor.
Equally sufficient is the evidence that her disappearance was the result of criminal agency. Despite evidence ruling out any connection, other than through defendant, of Mary Robinson with 77 Brooks Avenue, her purse, sandals, wallet, glasses, identification card and other personal effects were found in his apartment there within a week after her disappearance and the explanation he offered Ms. Hanrahan for their presence was proven false. Although he had given no indication of an intention to leave Rochester and, indeed, had preregistered for the fall 1976 semester at Monroe Community College, he left for Arizona precipitously within a week to 10 days after Mary Robinson’s disappearance and gave evidence of being emotionally overwrought before doing so. Defendant argues that the breakup of his relationship with Ms. Hanrahan could account for that, but the jury could have found from her testimony that their relationship was not going well before *573 she left on June 1 for Cape Cod, the more particularly so in view of the présence of Mary Robinson’s clothing and personal effects in defendant’s apartment.
To be sure, the evidence other than the confession does not establish Mary Robinson’s death or that defendant was the cause of it. But the question with respect to circumstantial evidence is “whether common human experience would lead a reasonable man, putting his mind to it, to reject or accept the inferences asserted for the established facts” (People v Wachowicz, 22 NY2d 369, 372; accord People v Kennedy, 47 NY2d 196, 203). The evidence reviewed above, when read with defendant’s confession, the poem he composed and his admissions to his two Provo coworkers, sufficiently establishes both Mary Robinson’s death and defendant’s strangulation of her as the cause of it to take the issues to the jury. More is not required for, as we said in People v Brasch (193 NY 46, 60-61), “It would shock common sense to say in the light of the confession that all of these circumstances do not in any degree tend to prove a crime, and that the requirements of the statute have not been satisfied, and that the defendant should be discharged because some other impossible evidence has not been produced.”
For the foregoing reasons, the order of the Appellate Division should be reversed and the verdict reinstated.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
Order reversed, etc.

. (See Perkins, The Corpus Delicti of Murder, 48 Va L Rev 173, 183: “Time and again courts have gone out of their way to emphasize that finding the dead body of the victim is not indispensible in a murder prosecution.”)

. The section read: “No person can be convicted of murder or manslaughter unless the death of the person alleged to have been killed and the fact of killing by the defendant, as alleged, are each established as independent.facts; the former by direct proof and the latter beyond a reasonable doubt.”

. Because that is so, our overruling of Ruloff (if its rule could be said to have survived enactment of the 1965 Penal Law) creates no ex post facto infirmity. R uloff’s direct evidence requirement was fully satisfied by defendant’s confessions and admissions.

. The absence of a requirement that proof connect the defendant was not a legislative oversight. Compare CPL 60.22, the accomplice corroboration rule, which requires “evidence tending to connect the defendant with the commission of such offense.”