Thomas **FISHER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–90–00108–CR.

Court of Appeals of Texas,
San Antonio.

March 31, 1992.

Jose M. Guerrero, Law Office of Jose M. Guerrero, Warren Alan Wolf, San Antonio, for appellant.

Steven C. Hilbig, Criminal Dist. Atty., Edward F. Shaughnessy, III, Mario De Prado, Mario Roman, Asst. Criminal Dist. Attys., San Antonio, for appellee.

Before PEEPLES, CARR and GARCIA JJ.

## OPINION

CARR, Justice.

A jury convicted appellant, Thomas Fisher, of murdering his girlfriend, Barbara Baughman, by drowning her. The victim's body, allegedly dismembered and disposed of, was never entirely recovered. The trial court assessed punishment at imprisonment for thirty years. Appellant now appeals the conviction with three points of error. We affirm the judgment.

■ In his first point of error, appellant contends that the jury instruction had a fundamental defect because it failed to require the State to disprove sudden passion, an issue allegedly raised by the evidence.[1] The record, however, reflects that the jury received no instruction on voluntary manslaughter and that appellant never requested such an instruction.[2] In addition, appellant did not object to the charge as given or request an instruction requiring the State to prove the lack of sudden passion. Because appellant did not make a proper objection to the charge at trial, we can reverse the judgment only if the alleged error was fundamental and caused egregious harm. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (opinion on rehearing).

An accused is entitled to an instruction on sudden passion when the evidence shows that he acted under the immediate influence of sudden passion[3] arising from adequate cause.[4] *See* TEX. PENAL CODE ANN. § 19.04 (Vernon 1989) (voluntary manslaughter statute).[5] Appellant contends that the following testimony of witness

---

1. The charge to the jury provided in part:
    Now if you find from the evidence beyond a reasonable doubt that on or about the 5th day of November, A.D., 1988 in Bexar County, Texas, the defendant, Thomas James Fisher, did intend to cause serious bodily injury to an individual, namely: Barbara Baughman, did commit an act clearly dangerous to human life, to-wit: submerging the said Barbara Baughman, under water, thereby causing the death of the said Barbara Baughman, then you will find the defendant guilty of murder as charged in the indictment.

2. Appellant does not raise a point of error complaining of the absence of an instruction on voluntary manslaughter.

3. "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.04(b) (Vernon 1989).

4. "Adequate cause" is "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL CODE ANN. § 19.04(c) (Vernon 1989).

5. We need not resolve the question appellant raises in his brief of whether the State has the burden to disprove sudden passion when evidence of sudden passion exists but the jury does not receive an instruction on voluntary manslaughter.

Caesar Marquez raised the issue of sudden passion:

Q. Okay. Did Thomas—Thomas told you, Thomas Fisher, the defendant, told you he killed Barbara Baughman. Now, did he tell you what happened?

A. He did.

Q. Okay.

A. He mentioned that she got upset with him because he took too long to go get his baby, his girl, his little baby on Saturday night. Okay. And when he got back she was very angry at him and she pulled a gun on him. And she said that she was going to kill him. And then he said that he grabbed her and I guess he took the gun away from her and he said, you are not going to kill anybody. He says, I am going to kill you.

So, he said that he got a cord, an electrical cord and, you know, strangled her. But then he let her go before she died and that she was gasping for air and she came back alive, literally, and then he dragged her to the bathtub that was already full of water for the baby to bathe and he drowned her.

We find that although this testimony reflects that appellant might have reacted to the victim's conduct, it does not establish that appellant acted under such a degree of anger, rage, resentment, or terror that rendered his mind incapable of cool reflection. *See* TEX. PENAL CODE ANN. § 19.04(c) (Vernon 1989); *see also Gonzales v. State,* 717 S.W.2d 355, 357–58 (Tex.Crim.App.1986) (accused's contention that he was scared of deceased was insufficient to raise issue of sudden passion). We further find that the rest of the record lacks any evidence raising the issue of sudden passion. Accordingly, we overrule appellant's first point of error.

In the next two points of error, appellant collectively contends that the evidence is insufficient to support his conviction.[6] Appellant, relying on *Self v. State,* 513 S.W.2d 832 (Tex.Crim.App.1974), argues that his conviction cannot stand because the State failed to establish the corpus delicti of the crime of murder. Appellant specifically argues that the State presented no evidence to establish that the victim's body was found and identified. We reject appellant's arguments because (1) Texas law no longer requires the discovery and identification of the deceased's body to obtain a murder conviction; and (2) in this case portions of the victim's body were found and adequately identified.

### TEXAS LAW DOES NOT REQUIRE THAT THE VICTIM'S BODY BE FOUND AND IDENTIFIED

■ The 1925 Texas Penal Code contained a statutory provision relating to the victim's body in a homicide prosecution. That provision, article 1204, provided as follows:

No person shall be convicted of any grade of homicide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the fact of the death of the person charged to have been killed.[7]

This provision, however, did not survive the implementation of the revised Texas Penal Code, which took effect on January 1, 1974. *See* Act of June 14, 1973, 63rd Leg., R.S., ch. 399, § 3, 1973 Tex.Gen. Laws 995 (current criminal homicide statutes at TEX. PENAL CODE ANN. §§ 19.01—19.07 (Vernon 1989 and Supp.1992)). We find that by repealing article 1204, the legislature effectively rejected the requirement that the body of the deceased be found and identified. With the repeal of article 1204, the corpus delicti requirements in a murder prosecution reverted to those established by law for all other crimes. *Williams v.*

---

6. Point 2: "The trial court erred in denying appellant's motion for instructed verdict after the close of all evidence."

Point 3: "The evidence presented by the State in the trial on the merits was insufficient to support a verdict of guilty."

7. Repealed by Act of June 14, 1973, 63rd Leg., R.S., ch. 399, § 3, 1973 Tex.Gen.Laws 995.

*State,* 629 S.W.2d 791, 796 (Tex.App.—Dallas 1981, pet. ref'd).[8]

Appellant recognizes the repeal of article 1204, but he contends that the State must still prove that the body of the deceased was found and identified. Appellant's contention is faulty for two reasons:

(1) his position conflicts with the established principles of ascertaining legislative intent as set forth in the Code Construction Act. *See* TEX. GOV'T CODE ANN. §§ 311.002, 311.021, 311.023 (Vernon 1988) (Code Construction Act); and

(2) appellant relies on five opinions from the Court of Criminal Appeals that do not squarely address the ramifications of the repeal of article 1204. *See Baldree v. State,* 784 S.W.2d 676 (Tex.Crim.App. 1989), *cert. denied,* 495 U.S. 940 [110 S.Ct. 2193, 109 L.Ed.2d 521] (1990); *Soffar v. State,* 742 S.W.2d 371 (Tex.Crim. App.1987), *cert. denied,* 493 U.S. 900 [110 S.Ct. 257, 107 L.Ed.2d 206] (1989); *Dunn v. State,* 721 S.W.2d 325 (Tex. Crim.App.1986); *Streetman v. State,* 698 S.W.2d 132 (Tex.Crim.App.1985); *Nathan v. State,* 611 S.W.2d 69 (Tex.Crim. App. [Panel Op.] 1981).

Appellant erroneously relies on *Baldree* for the proposition that if the State fails to produce the body of the deceased, the evidence is legally insufficient to support the conviction. *Baldree* does not so hold because that issue never arose in that case. In *Baldree* the bodies of the victims were found and identified, and the appellant in that case did not challenge the sufficiency of the evidence to support the conviction. Appellant's misreading of *Baldree* is apparently based upon the *Baldree* court's citation to *Self v. State,* 513 S.W.2d 832, 834–35 (Tex.Crim.App.1974), in which the Court of Criminal Appeals, citing to former article 1204, provided that one element of the corpus delicti in a murder prosecution is

that the body or remains of the deceased be found and identified.[9] The *Baldree* court, however, cited to *Self* simply to address a contention that the trial court had erred in failing to charge the jury that an oral confession must be corroborated in order to support a conviction. *See* 784 S.W.2d at 686–87. Because *Baldree* does not address what effect the repeal of article 1204 had upon Texas criminal jurisprudence, *Baldree* does not support a holding that the requirements of article 1204 remain in force.

Appellant's reliance on *Soffar v. State* is also misplaced. The specific issue presented in *Soffar* differs from the question presented in this case in two ways. First, the bodies of the victims in *Soffar* were found and identified. Second, the Court of Criminal Appeals cited to *Self* simply to discuss the requirement that extrajudicial confessions must be corroborated. *See* 742 S.W.2d at 375.

The third case relied upon by appellant, *Dunn v. State,* is another case that refers to *Self* in a context inapplicable to the instant case. The inapplicability of *Dunn* is again the result of two distinguishing factors. First, the body of the deceased was found and identified. Second, the *Self* holding is utilized only in the context of the requirement that extrajudicial confessions must be corroborated to support a murder conviction. *See Stephens v. Great Southern Savings & Loan Ass'n,* 421 S.W.2d 332, 333 (Mo.App. 1967).

The fourth case appellant relies on, *Streetman v. State,* also does not apply to the issue presented in this case. *Streetman* is yet another example of a murder conviction in which the holding of *Self* is cited in a discussion relating to the corroboration of extrajudicial confessions. In *Streetman,* furthermore, the victim's body was found and identified. Interestingly,

---

**8.** In affirming the conviction in *Williams,* the Fifth Court of Appeals of Dallas provided:

The record in this case reflects that the body of the deceased was never found and no scientific evidence was presented that established the cause of death. With the repeal of the old penal code in 1974, the State no longer must find the body of the decedent to prove the

corpus delicti of a homicide. Consequently, the corpus delicti in a homicide case can be proved in the same manner as any other crime. 629 S.W.2d at 796.

**9.** In *Self,* however, the appellant did not contend that the remains of the deceased were not found and identified. *See* 513 S.W.2d at 834.

the Court of Criminal Appeals in *Street-man* pointed out that the present penal code does not include the requirement of former article 1204. The court then added:

Thus, the question arises, did the Legislature's failure to bring forward the former provision abolish the first element of the corpus delicti of the crime? Because in this instance the State proved up the body of the deceased, we need not today answer the posed question.

698 S.W.2d at 134–35 n. 1; *see also Shannon v. State*, 567 S.W.2d 510, 514 (Tex. Crim.App. [Panel Op.] 1978) (Court of Criminal Appeals chose not to consider what effect the repeal of article 1204 had on Texas criminal jurisprudence); *Easley v. State*, 564 S.W.2d 742, 747 (Tex.Crim.App. [Panel Op.]), *cert. denied*, 439 U.S. 967, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978) (same).

The final case relied upon by appellant, *Nathan v. State*, also does not apply here. First, *Nathan* is inapplicable because it involved a prosecution for "murder with malice" under the 1925 Texas Penal Code. At the time of the *Nathan* trial, therefore, article 1204 did apply. Second, as noted by the *Nathan* court, the accused in that case "candidly admits that the circumstantial evidence is sufficient to support the jury's finding that the body of the deceased was found and identified." 611 S.W.2d at 76.

A close examination of the opinions cited by appellant reveals that the Texas Court of Criminal Appeals has not resolved the issue of whether, in light of the repeal of article 1204, the State must still produce and identify the body or remains of the body of the deceased in order to convict an individual of murder. *See* Michael E. Wheeler, *Invitation to Murder?: Corpus Delicti, Texas–Style*, 30 S.Tex.L.Rev. 267 (1989). We choose to follow the lead of the Dallas Court of Appeals' opinion in *Williams* and that of our sister jurisdictions that have held that in a prosecution for murder, the State can prove all the elements of the offense by way of circumstantial evidence and need not produce and identify the body of the deceased. *See, e.g., State v. Brown*, 310 Or. 347, 800 P.2d 259, 272–73 (1990); *Commonwealth v.*

*Smith*, 523 Pa. 577, 568 A.2d 600, 605 (1989); *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236, 1239 (1988); *State v. Neslund*, 50 Wash.App. 531, 749 P.2d 725, 733 (1988); *Campbell v. State*, 500 N.E.2d 174, 179 (Ind.1986); *State v. Hicks*, 495 A.2d 765, 769 (Me.1985); *Hurley v. State*, 60 Md.App. 539, 483 A.2d 1298, 1303–04 (1984), *cert. denied*, 302 Md. 409, 488 A.2d 500 (1985); *State v. Rebeterano*, 681 P.2d 1265, 1267 (Utah 1984); *People v. Lipsky*, 57 N.Y.2d 560, 457 N.Y.S.2d 451, 443 N.E.2d 925, 930 (1982); *Epperly v. Commonwealth*, 224 Va. 214, 294 S.E.2d 882, 890–91 (1982); *Derring v. State*, 273 Ark. 347, 619 S.W.2d 644, 647 (1981); *People v. Manson*, 71 Cal.App.3d 1, 139 Cal.Rptr. 275, 298 (1977), *cert. denied*, 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978); *State v. Zarinsky*, 143 N.J.Super 35, 362 A.2d 611, 621 (1976), *aff'd* 75 N.J. 101, 380 A.2d 685 (1977); *State v. Pyle*, 216 Kan. 423, 532 P.2d 1309, 1316–1317 (1975). A California appellate court has concisely set forth the rationale for abandoning the requirement that the body of a homicide victim be found and identified:

The fact that a murderer may successfully dispose of the body of the victim does not entitle him to an acquittal. That is one form of success for which society has no reward.

*Manson*, 139 Cal.Rptr. at 298. We agree with this rationale.

We hold that as a result of the legislative repeal of article 1204, the State's inability to produce and identify the victim's body does not preclude a conviction for murder so long as the corpus delicti of the offense is proven by way of circumstantial evidence.

### PORTIONS OF THE VICTIM'S BODY WERE FOUND AND IDENTIFIED

We now turn to the question of whether the evidence is sufficient to support the conviction. In reviewing the sufficiency of the evidence, this court must determine whether, considering the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Little v. State*, 758 S.W.2d 551, 562 (Tex.Crim.App.), *cert. denied*, 488 U.S. 934, 109 S.Ct. 328, 102 L.Ed.2d 346 (1988). This standard is applicable to both direct and circumstantial evidence cases. *Little*, 758 S.W.2d at 562; *Chambers v. State*, 711 S.W.2d 240, 244–45 (Tex.Crim.App.1986).

In applying the above standard to circumstantial evidence cases, we consider whether the circumstances exclude every other reasonable hypothesis except that of the guilt of the accused. *Butler v. State*, 769 S.W.2d 234, 238 n. 1 (Tex.Crim.App. 1989).[10] The evidence, moreover, must exclude only reasonable outstanding hypotheses, not every conceivable hypothesis. *Hooker v. State*, 621 S.W.2d 597, 601 (Tex. Crim.App. [Panel Op.] 1980). Furthermore, it is not necessary that every fact point directly and independently to the accused's guilt. *Flores v. State*, 551 S.W.2d 364, 367 (Tex.Crim.App.1977). It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Id.* According to the Court of Criminal Appeals,

> [t]he rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence.

*Id.* It is the jury, as the trier of fact, and not this court, that has the tasks of resolving any conflicts in the evidence and weighing the credibility of the witnesses. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex.Crim. App.1986), *cert. denied*, 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988); *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim.App. [Panel Op.] 1981).

Viewed in the light most favorable to the verdict, the record reflects the following: Caesar Marquez, who lived at 3501 Buena Vista in San Antonio, Texas, knew appellant through work and considered him a friend in a business sense. According to Marquez, he knew that appellant lived with his girlfriend, Barbara Baughman, whom Marquez had met once or twice.

On the morning of November 7, 1988, Marquez was having breakfast at home with his wife, brother, and children when appellant telephoned and expressed a need to speak with Marquez. When appellant arrived approximately an hour later in his brown Cadillac, Marquez and his brother were on the second floor of the house they were building on the next-door lot. Marquez saw appellant exit the Cadillac and walk toward the alley located behind Marquez's two lots. Marquez then noticed appellant spreading dust or ashes from one or two small plastic bags appellant had brought from the car. Appellant was in the alley for two or three minutes and then left the alley and went to the Marquez's residence to knock on the door. Marquez and his brother met appellant at the doorstep and then followed appellant back to the Cadillac. Once at the car, appellant pulled out two green garbage bags, each about half full, and handed one to Marquez. Appellant asked Marquez to put the bag with Marquez's own trash, which stood next to the Marquez driveway. Appellant placed the other bag with the trash. A short time later, appellant handed Marquez an almost new, bright yellow suitcase with its handle missing. According to Marquez, the suitcase felt light and appeared to be empty. Marquez later saw the suitcase handle in appellant's car. Appellant also set the suitcase, which displayed Barbara Baughman's name and social security number, out with the Marquez's trash.

Appellant told Marquez that he needed to make two phone calls at a convenience store. Appellant also told Marquez that he needed to speak with Marquez alone. Mar-

---

**10.** The record reflects that appellant's trial took place before the effective date of *Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App.1991), in which the Texas Court of Criminal Appeals held that the "reasonable hypothesis analysis" would not apply to cases tried after November 6, 1991.

quez agreed to accompany appellant. Upon arriving at the convenience store, appellant asked Marquez if he had ever done anything illegal. Marquez replied that he had not. Appellant then made his phone calls, returned to the car, and told Marquez that he had done something he was not proud of. Appellant then admitted that he killed Barbara, the victim. Marquez testified that they then drove around for about an hour and a half, during which time appellant stated that he was looking for a place to dump some things, including the suitcase handle. When they arrived at a dump on Pinn Road, appellant smashed the handle of the suitcase with some pipe wrenches. Appellant later threw the smashed handle on an empty lot by Highway 90 and Military Drive.

During the ride, appellant told Marquez that the victim had become upset with him and had pulled out a gun threatening to kill him. Appellant told Marquez that he grabbed the victim and strangled her with an electrical cord, letting her go before she died. Appellant then pulled the victim to a water-filled bathtub and drowned her. Appellant later decapitated the victim, cut off her fingers, and cut off one of her arms and tried to put it down the garbage disposal. He then burned her fingers on the stove so that she could not be identified.

Appellant then asked Marquez if the victim's body could be buried underneath the house Marquez and his brother were building. Marquez, however, refused. Appellant then admitted that he would either go to Mexico or north Texas to dump the body. Appellant told Marquez that nobody would miss the victim because she had no friends and she had not seen her parents for over eight years. A short time later, Marquez left with his brother to do some repair work. He returned home that afternoon and decided to check what appellant had dumped in the alleyway. He found bones and ashes in the same location appellant had been dumping the contents of the bags. Marquez then told his brother and his wife about appellant's confession. The following day, Marquez notified Officer Alvaro Coronado about what appellant had told him. Marquez showed Coronado the bones. Detectives with the San Antonio Police Department and the Medical Examiner's Office were subsequently notified.

Marquez volunteered to wear a microphone placed on him by the San Antonio Police Department when he met with appellant the following afternoon. According to Marquez, appellant appeared exhausted and worn out and stated that he had taken care of the victim's body.

Julio Marquez, Caesar Marquez's brother, testified that he knew appellant and had met the victim. On the morning of November 7, 1988, Julio was helping his brother build a house. They were on the second floor of the house when he noticed appellant in the back alley. Appellant had one or two white plastic bags and was spreading the contents throughout the alley. Julio and his brother then met appellant in the alley. Julio later saw appellant take a bag and suitcase out of his car and heard appellant tell Caesar Marquez to put the bag and suitcase next to the trash so they could be picked up. Appellant and Caesar Marquez then drove off. Julio further testified that his brother later told him of appellant's confession and that he also saw the bones in the alley.

Mrs. Adrianna Marquez, Caesar Marquez's wife, testified that she knew appellant and that he would sometimes come over to the Marquez home, either alone or with his girlfriend, the victim. According to Mrs. Marquez, on the morning of November 7, 1988, at approximately 9:00 a.m., appellant telephoned her husband. Appellant arrived at around 11:00 a.m., alone, and in his Cadillac. She heard the car door slam, looked out her living-room window, which is located in the back of the home and faces the alley. At this time she noticed appellant with two small plastic bags. Appellant walked to the alley. Starting at the telephone pole, appellant began walking backwards while spilling something along the grassy area. After doing this for two to three minutes, appellant started to walk back to the house. Appellant then knocked on the door, and Mrs. Marquez told him that her husband was next door

with her brother-in-law, working on the new house.

Mrs. Marquez further testified that she knew her husband had left with appellant, but she did not know where they had gone. Upon their return a couple of hours later, she noticed that her husband acted strangely and appeared to be avoiding appellant. She asked appellant about Barbara, the victim. Appellant responded that Barbara had left him Saturday night, and he did not know where she had gone. Appellant also told her that the victim had left with most of her belongings. Mrs. Marquez testified that she noticed later that day two trash bags and a suitcase sitting with their own trash. Mrs. Marquez found it strange that appellant had brought his trash to their house. She also heard appellant ask her husband to accompany him on a repair job in appellant's car and that appellant was quite insistent that he go. Upon returning from the repair job at around 4:00 p.m., Marquez informed his wife that appellant had confessed to killing the victim, Barbara Baughman.

Remembering that appellant had dumped something in the alley, Mr. and Mrs. Marquez went to the alley and found what appeared to be bone fragments and ashes. Upon the arrival of members of the San Antonio Police Department and someone from the Medical Examiner's Office, Mrs. Marquez directed them to the telephone pole in the alley where they found more bones.

Officer Alvaro Coronado of the San Antonio Police Department testified that he was the patrolman for an area including Buena Vista Street. On November 7, 1988, at approximately 11:30 a.m., he saw a beige or brown Cadillac with two people in it. He recognized Caesar Marquez but not the other individual. On November 8, 1988, Caesar Marquez, whom he had known for approximately five years, approached him, nervous and scared, saying that he had a problem. After hearing what Marquez told him, Officer Coronado went with Marquez to the alley behind the Marquez home to look for human bones. They found ashes and severely charred bones. Officer Coro-

nado testified that he instructed Marquez not to disturb the area while he notified the police.

Detective Alvin Brown testified that on November 8, 1988, he reported to the 3500 block of Buena Vista to investigate the murder of Barbara Baughman. He was directed to the alley behind the Marquez residence where he observed what appeared to be human bone fragments and ashes. Officer Brown had the alley sealed off and secured the assistance of Dr. Robert Bux of the Medical Examiner's Office. Officer Brown further testified that in order to help with the investigation, a hidden body transmitter was placed on Caesar Marquez to record Marquez's conversation with appellant.

Officer Brown further testified that he tried to detect any activity that might indicate that Barbara Baughman was still alive. For example, he checked on her bank account for any activity; ran her Texas driver's license for possible tickets or accidents; and checked with the San Antonio Police Department, the Department of Public Safety, and the Federal Bureau of Investigation for any criminal activity. He also checked with the Texas Employment Commission, City Public Service, and the City Water Board. Nothing indicated that Barbara Baughman still lived.

Officer Frank Castillon, Jr. of the San Antonio Police Department testified that on November 8, 1988, Detective Alvin Brown contacted him to help wire a witness, Caesar Marquez. Castillo placed a body transmitter on Marquez and told him to let the suspect, appellant, do the talking and not to put words in the suspect's mouth. The conversation between Marquez and appellant was monitored and recorded on tape. After the conversation ended, appellant was arrested.

Fred Zain, of the Bexar County Medical Examiner's Office and Crime Lab, testified that he was in charge of receiving and examining physical evidence. He testified that he took the following items into evidence and that they tested positive for the presence of blood: 1) a General Electric garbage disposal; 2) a plastic J-shaped

plumbing trap and water; and 3) a man's blue plaid western-style shirt. According to Zain, the items were tested with benzidine, which can detect the presence of blood.

James Jerigan, a letter carrier with the United States Postal Service, testified that his route included 13331 Marcelline. Jerigan testified that he would deliver mail for both the victim and appellant at this address, and that he would see both the victim and appellant on occasion. According to Jerigan, at the end of November 1988, the postal service began returning the victim's mail to sender. Jerigan also stated that the postal service never received a change of address card from the victim and that if the victim had submitted one, he would have been notified.

San Antonio Police Department Sergeant William Turner testified that he tested for traces of blood at appellant's residence using a blood-detecting chemical known as Luminol. He stated that the police department uses Luminol because its chemical makeup reacts with very small traces of blood not visible under normal light and normal viewing. According to Turner, an area of about four inches in diameter on a man's western shirt reacted to the Luminol.

Terri Kelley testified that on November 6, 1988, or November 7, 1988, she noticed a carpet-cleaning or steam-cleaning truck without any sort of identification parked behind appellant's house. She noticed hoses coming from the vehicle, and it caught her attention because she had used the same type of steam-cleaning trucks in her own business as a property manager.

Frank Castillon, Sr.[11] of the Bexar County Medical Examiner's Office testified that he met Dr. Robert C. Bux, the Bexar County Medical Examiner, in the alley located behind 3501 Buena Vista. Castillon discovered two batches of what appeared to be burned trash, limbs, or twigs. He stated that the particles he collected and bagged as evidence appeared burned and charred. The area where he found this evidence, however, did not appear burned. According to Castillon, he inferred that the evidence had been burned elsewhere.

Dr. Robert C. Bux, Bexar County Medical Examiner, testified that he responded to a call regarding the discovery of apparent human remains in an alley behind 3501 Buena Vista. Upon arriving, Bux noticed what appeared to be charred wood and human bones in two separate areas. He also found recognizable portions of bone that had been completely burned and what appeared to be soft tissue, possibly muscle. Bux collected the evidence and took it to the morgue for further analysis. According to Bux, the evidence contained portions of eight human fingers and two human thumbs from one individual. He further stated the following: the burning of bones requires a tremendous amount of heat over a significant period of time; the bones had to have been burned in a different location because the area in which the evidence was found was not burned; and the bones had probably not been in the location in which they were found for a lengthy period of time. In addition, in his opinion a homicide had occurred because a single set of fingers and thumbs was found with no duplication of bone parts.

Dr. David Glassman, an assistant professor of anthropology at Southwestern Texas State University, testified that in November 1988 Dr. Bux gave him a set of bones to analyze. Glassman determined that the bones were human and had been charred. He further indicated that each bone had unique characteristics, and that because of the various sizes, it appeared that they had come from one individual. All the bones represented either the middle or end of a finger or one of the two bones found in the thumb. The bones belonged to someone with a minimum age of fourteen years. Glassman also opined that the fingers had been cut off before being burned.

After viewing the evidence in the light most favorable to the verdict, we conclude that the circumstantial evidence in the instant case is sufficient to establish that the

---

11. Frank Castillon, Sr. of the Bexar County Medical Examiner's Office is the father of Frank Castillon, Jr. of the San Antonio Police Department, who also testified at trial.

portions of the body discovered were indeed portions of the body of the victim. The evidence, therefore, is sufficient to sustain the conviction. Based on the foregoing analysis, we overrule appellant's points two and three.

The judgment of the trial court is affirmed.