People v Williams (2025 NY Slip Op 00901)

People v Williams

2025 NY Slip Op 00901 [43 NY3d 1030]

February 18, 2025

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, August 13, 2025

[*1]

The People of the State of New York, Respondent,
v
Raymond Williams, Appellant.

Argued January 8, 2025; decided February 18, 2025

PROCEDURAL SUMMARY

Appeal, by permission of a Justice of the Appellate Division of the Supreme Court in the First Judicial Department, from an order of that Court, entered May 9, 2023. The Appellate Division affirmed a judgment of the Supreme Court, New York County (Daniel P. FitzGerald, J.), which had convicted defendant, upon a jury verdict, of burglary in the third degree.

People v Williams, 216 AD3d 466, affirmed.

HEADNOTES

Crimes
 - Burglary
 - Sufficiency of Evidence
 - Trespass on Store Premises with Intent to Steal

1. The evidence at defendant's trial was legally sufficient to support his conviction of burglary in the third degree (Penal Law § 140.20) based on his trespass on the premises of a retail store with the intent to steal energy drinks. With respect to the knowledge element, a rational jury could have found that defendant knew his entry into the store was unlawful based on the trespass notice that defendant signed, barring him from entering any of the retail store's locations, as well as the testimony of the store employee who explained the trespass notice to defendant. With respect to the intent element, a rational jury could have found that defendant entered the store with the intent to commit a crime therein. Surveillance footage depicted defendant engaging in behavior outside and inside the store that a jury could have rationally viewed as furtive. In addition, the store manager testified that, when she told defendant to stop and give her the drinks, defendant became upset, "slammed" the items down, and left without protest. The jury also could have reasonably concluded that defendant's statements to the police during an interview, including that he "f—d up," he "did it," and "all [he] took was a [R]ed [B]ull," constituted an admission of his intent to steal even if—as defendant contended—some of those statements could also be interpreted as referencing a separate incident.

Crimes
 - Confession
 - Corroboration

2. Defendant, who was convicted upon a jury verdict of burglary in the third degree (Penal Law § 140.20) based on his trespass on the premises of a retail store with the intent to steal energy drinks, failed to preserve any argument that his confession to the police was not sufficiently corroborated (see CPL 60.50) and therefore could not be used to establish his guilt. In any event, the People introduced "additional proof that the offense charged ha[d] been committed" (id.).

APPEARANCES OF COUNSEL

Cleary Gottlieb Steen & Hamilton LLP, New York City (Ayushe Misra and Rishi Zutshi of counsel), and Caprice R. Jenerson, Office of the Appellate Defender, New York City (Margaret Knight of counsel), for appellant.
Alvin L. Bragg, Jr., District Attorney, New York City (Anna Notchick, Steven C. Wu and Grace Vee of counsel), for respondent.

{**43 NY3d at 1033} OPINION OF THE COURT

Memorandum.
The Appellate Division order should be affirmed.
Defendant contends that the evidence was legally insufficient to support his conviction of burglary in the third degree (Penal Law § 140.20). We reject that contention. "A verdict is legally sufficient when, viewing the facts in a light most favorable to the People, 'there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt' " (People v Danielson, 9 NY3d 342, 349 [2007], quoting People v Acosta, 80 NY2d 665, 672 [1993]). "A sufficiency inquiry requires a court to marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (id.).
[1, 2] Here, defendant was charged with burglary in the third degree based on his trespass on the premises of a CVS store with the intent to steal Red Bull energy drinks. A person is guilty of burglary in the third degree when such person "knowingly enters or remains unlawfully in a building with intent to commit a crime therein" (Penal Law § 140.20). With respect to the knowledge element, a rational jury could have found that defendant knew his entry into the store was unlawful based on the trespass notice that defendant signed, barring him from entering any CVS location, as well as the testimony of the CVS employee who explained the trespass notice to defendant (see People v [*2]Magnuson, 177 AD3d 1089, 1091 [3d Dept 2019]; People v Pearson, 163 AD3d 446, 447 [1st Dept 2018]; People v Polite, 302 AD2d 227, 227 [1st Dept 2003]). With respect to the intent element, a rational jury could have found that defendant entered the CVS with the intent to commit a crime therein. Surveillance footage depicted defendant engaging in behavior outside and inside the store that a jury could have rationally viewed as furtive. In addition, the store manager testified that, when she told defendant to stop and give her the Red Bull, defendant became upset, "slammed" the items down, and left without protest. The jury also could have reasonably concluded that defendant's statements to the police during an interview, including that he "f—d up," he "did it," and "all [he] took was a [R]ed [B]ull," constituted an admission of his intent to steal even if—as defendant contends—some of those statements could also be interpreted as referencing a separate incident.[FN*]
Contrary to defendant's suggestion, the availability of innocent explanations for his conduct did not preclude the jury from rationally finding that the People proved the elements of burglary in the third degree beyond a reasonable doubt (see People v Reed, 22 NY3d 530, 535 [2014]; People v Grassi, 92 NY2d 695, 699 [1999]). At most, defendant identifies competing inferences to be drawn from the evidence, which a rational jury could have rejected (see People v McDade, 14 NY3d 760, 761 [2010]; People v Barnes, 50 NY2d 375, 381 [1980]).

Chief Judge Wilson (dissenting).
Two cans of Red Bull cost about $6. Seven years of incarceration costs anywhere between $800,000 and $4 million, depending on the location within New York State.[FN1] For attempting to take two cans of Red Bull from a CVS, Raymond Williams was convicted of third-degree burglary, a felony, and sentenced to 31/2 to 7 years in prison. Mr. Williams was a perpetual petty shoplifter with substance abuse and mental health problems, so perhaps this result makes sense to someone. It does not to me.
[*3]
Mr. Williams's story is not uncommon. For much of his life, he has struggled with homelessness and drug addiction. Both factors disproportionately increase the risk of being caught up in the criminal justice system and sentenced to spend time in prison. Mr. Williams had previously been found guilty of many minor shoplifting offenses, including from other CVS stores. His problems were addressed by sentences of incarceration and probation, not treatment.
Mr. Williams's prosecution occurred in 2017. His appeal comes to us eight years later, and the People's brief in our Court explains that what happened to Mr. Williams back then is not what would happen now:
"For retail-theft cases where a defendant does not present a serious public safety risk, the Office now typically pursues multiple alternatives to incarceration. Defendants charged with a retail-theft felony are frequently diverted to the problem-solving courts under CPL Article 216 or similar provisions,{**43 NY3d at 1034} where, in place of incarceration, they can receive programming to address underlying problems of substance abuse, mental health, and more. Defendants charged with a retail-theft misdemeanor are also routinely directed to an array of behavioral health court parts and programs, including the Midtown Community Justice Center, Manhattan Justice Opportunities, and others."
Putting both psychiatric and fiscal wisdom aside, although it was within the discretion of prosecutors to charge Mr. Williams with felony burglary instead of, for example, petty larceny or trespass, the trial evidence was legally insufficient to convict him of burglary. No evidence in the case could have led a jury to conclude beyond a reasonable doubt that Mr. Williams intended to steal the two Red Bulls. I would therefore reverse his conviction.
I.
In reviewing the legal sufficiency of evidence supporting a conviction, we consider the evidence in the light most favorable to the People (People v Acosta, 80 NY2d 665, 672 [1993]). The bulk of the evidence is the video captured on store cameras, which is unambiguous.
On the morning of January 19, 2017, Raymond Williams entered the CVS store at 300 Park Avenue South in Manhattan. Several store cameras captured his movements and actions within the store. He can be seen walking past the store at first, then turning back and entering the store. He was carrying a bag. Once inside, Mr. Williams turned right and walked down the second aisle from the front of the store, glanced over his shoulder, then turned again and proceeded down the aisle with the beverage coolers. He opened one of the coolers, reached in, and removed two cans. Holding one can in each hand, he walked down the aisle toward the front of the store. He did not exit the store with them, but instead walked past the exit toward the self-checkout area. He never put, or attempted to put, the cans into his bag or pockets. A CVS employee recognized him as someone subject to a trespass notice (a document he signed several months earlier at a different CVS store, which barred him from entering any CVS stores because of prior thefts) and directed the head cashier to alert the store manager. The manager confronted Mr. Williams near the self-checkout and asked him to leave ("She tells him stop. Give the items. You don't belong here"). Mr. Williams handed over the cans and left. The manager returned the cans to the cooler.{**43 NY3d at 1035}
The CVS employee who recognized Mr. Williams testified that she recognized Mr. Williams as someone subject to a trespass notice, so she told the cashier to page for the store manager. The cashier paged over the loudspeaker ("Security to the front, please"). The employee testified that Mr. Williams "got upset" and "slammed" the Red Bulls down after the manager confronted him.
The jury found Mr. Williams guilty of third-degree burglary, and the court sentenced him, as a second violent felony offender, to the maximum term of 31/2 to 7 years.
II.
"A person is guilty of burglary in the third degree when he [or she] knowingly enters or remains unlawfully in a building with intent to commit a crime therein" (Penal Law § 140.20). "A person 'enters or remains unlawfully' in or upon premises when he [or she] is not licensed or privileged to do so" (Penal Law § 140.00 [5]). "A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his [or her] conscious objective is to cause such result or to engage in such conduct" (Penal Law § 15.05 [1]).
[*4]
Viewed in the light most favorable to the People, the trial evidence was insufficient to allow a jury to conclude beyond a reasonable doubt that Mr. Williams intended to steal when he entered the CVS at 300 Park Avenue South. The People argue that the jury could have rationally inferred Mr. Williams's intent to steal two Red Bulls from three actions: First, he paused before entering the store, moved on, then entered a few seconds later; second, he looked over his shoulder at the end of an aisle; and third, after being told to leave, he "slammed" the Red Bulls down. None of those actions tends to show an intent to steal. The first two are everyday occurrences. Likely everyone reading this has bypassed a store and then turned around thinking the store might have something the person wants to buy. People walking into stores, particularly unfamiliar stores, look around all the time. Finally, slamming down the Red Bulls and leaving the store after being told "Stop. Give the items. You don't belong here" does not say anything about what he intended to do before being stopped.
Mr. Williams's conduct cannot rationally be linked to guilt. A legal sufficiency analysis requires that we view the evidence "in the light most favorable to the People." "[S]urmise or conjecture" cannot suffice (see e.g. {**43 NY3d at 1036}People v Castillo, 47 NY2d 270, 277 [1979] ["(T)he foundation for the findings must be facts and inferences that are so reasonable that they cannot be confused with mere conjecture or suspicion"]; People v Scharf, 217 NY 204, 211 [1916] ["It is not enough to create a conjecture or suspicion, nor should the jury be permitted to guess at the truth . . . A mere surmise or conjecture does not raise a conflict of proof or a question of fact"]).[FN2]
The majority states that the surveillance footage depicted Mr. Williams "engag[ed] in behavior outside and inside the store that a jury could have rationally viewed as furtive" (majority op at 
1032). The majority does not specify what was conceivably "furtive" about Mr. Williams's behavior. The standard for legal sufficiency is whether an inference is rational and makes the relevant legal question at least a bit more likely than not. If the evidence showed that Mr. Williams, immediately before entering the CVS, hopped on one foot through a chalk hopscotch grid a child had drawn in front of the store, we would not conclude that was evidence of an intent to steal, any more than bypassing a store and turning back to enter it would (indeed, the first is more unusual than the second, but neither bears on intent to steal). One can argue anything, including (as the People did) that Mr. Williams's glancing over his shoulder or pausing before entering the store proved his guilt. But that conduct could not reasonably support a finding of guilt.
The majority also implies, as the People did, that Mr. Williams's intent can be inferred from his inaction: Mr. Williams did not attempt to pay for the Red Bulls when confronted by the store manager. Again, Mr. Williams, who had previously signed a trespass notice saying that he could not enter any CVS, was instructed that he did not belong in the store and to give the drinks back. Nothing about that, taken in the light most favorable to the People, could lead a jury to find beyond a reasonable doubt that Mr. Williams intended to steal the Red Bulls.{**43 NY3d at 1037}
Finally, with nothing in Mr. Williams's conduct to support any inference of intent, the majority relies on statements he made to police, a month later, that he "f—d up," he "did it," and "all [he] took was a [R]ed [B]ull." The detective's interrogation of Mr. Williams a month after the incident does not line up at all with the unambiguous video evidence or testimony of the store employees. The majority selectively excerpts those statements out of a portion of the interrogation during which Mr. Williams admits to drinking a Red Bull "in the store." The full statement reads as follows:
[*5]
"I f—d up, you know what I'm saying? I did it. I did it. I'm not going to say I didn't do it—I did it. I did it, it's bringing back memories. I was high running around crazy doing drugs and I was running, I was thirsty. I did have the Red Bull, the other Red Bull, I drunk it, I'm not going to lie. I had one Red Bull—I drank it in the store—then the lady told me put it back. I said hey—I told her I was thirsty and that's all I took out was a Red Bull, that's it. This is real different now. That's what going to hurt me."
It is crystal clear from the surveillance video that Mr. Williams did not drink a Red Bull in the store, and the People do not claim that he did. His admission was also contradicted by the CVS employee's testimony that she took two unopened Red Bulls from him and returned them to inventory. No rational trier of fact could conclude that those statements related to the events at 300 Park Avenue South on January 19, for which he was tried.
The absence of confession to the charged crime is entirely a consequence of the way the detective conducted the questioning and Mr. Williams's confused state. At the beginning of the interview, the detective explained to Mr. Williams that he was accused of two different trespassing violations at two different CVS stores in Manhattan on January 19th. She then gave Mr. Williams a description of his conduct that is contrary to the surveillance video, and never once asked a clear question about the charged event. Mr. Williams repeatedly expressed confusion about the time and location of the incidents they were discussing. When the detective showed him the trespass notice and asked if it had been given to him, Mr. Williams responded, "That same day." The detective corrected him and stated he received the notice in September 2016. Williams then asked, "This CVS? Which CVS is this? Is this the same CVS?" The jury was only aware of a single incident, and was led to believe{**43 NY3d at 1038} that the entire conversation between Mr. Williams and the detective involved a single incident at a single CVS store. It did not. Perhaps Mr. Williams was confessing to the commission of a different crime, in a different location, at a different time. But we do not allow a jury to impute intent to commit a crime from commission of other crimes.
Even when read out of context, as the majority does, Mr. Williams's statements do not establish his intent to steal two Red Bulls when he entered the store, as required for burglary (see People v Gaines, 74 NY2d 358, 363 [1989] ["(I)n order to be guilty of burglary for unlawful entry, a defendant must have had the intent to commit a crime at the time of entry"]). The statements would at most support a conviction for petty larceny, which does not require that Mr. Williams had the intent to steal when he entered the store.
Additionally, CPL 60.50 provides that "[a] person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed" (CPL 60.50; see People v Lipsky, 57 NY2d 560, 571 [1982]; see also CPL 70.10 [1] ["evidence is not legally sufficient when corroboration required by law is absent"]). Neither the store video nor the testimony constitutes any proof that the offense of third-degree burglary was committed, so his conviction for burglary should be reversed.
III.
Imprisoning someone for attempting to walk off with two cans of Red Bull—even a recidivist Red Bull shoplifter—for 31/2 to 7 years is very hard to justify to the public. Belatedly, one of the jurors in Mr. Williams case recognized that, and also explained that the jury convicted Mr. Williams based not on the evidence of his conduct that day, but on the trespass notice from a prior incident, thus underscoring the point that the evidence offered as proof of Mr. Williams's intent to steal was insufficient to persuade the jury. At trial, the court instructed the jury that the trespass notice could not be used to show that Mr. Williams intended to steal or had a propensity to steal, but could be used by the jury solely to establish that Mr. Williams's entry to the CVS was unlawful, which is a necessary element of burglary. One of the jurors wrote the following to the court after conviction but before sentencing:
"If you recall, you came and briefly spoke with the{**43 NY3d at 1039} jury after the case—you said that Mr. Williams had something around 60-70 prior convictions, presumably as a means of reassuring us of our verdict. Unfortunately, this did not provide me any such solace. What I saw was a man with a history of poverty and drug use, characterized as a criminal. I believe that you decide your sentences based on fair justice and the well-being of the people of New York, but I must plead that you offer Mr. Williams your sympathy regarding his sentence. I know that he could be sentenced up to 7 years for the crime of burglary, especially given his criminal record, but this case was only a burglary in the very loosest interpretation of the law. 7 years for this crime, given the facts of the case, is a ridiculously harsh sentence. I ask that you consider Mr. Williams as a well intentioned man, who does not deserve to be imprisoned for this mistake. You said yourself that Mr. Williams's prior transgressions should not be counted against him, and I ask that you employ that same logic here.
"Please, Judge Fitzgerald, please choose a sentence for Mr. Williams that matches the severity of this crime. No one was hurt, the Red Bulls were put back on the shelves, and the defendant clearly lacked knowledge of his trespass order. I'm not sure what the minimum sentence is for this case, but I implore you to choose that minimum, or as close to it as you can.
"In the deliberation room, I argued adamantly for Mr. Williams's innocence. It seemed that despite having signed the trespass notice, Mr. Williams did not seem to have recollection of the trespass order, and thus could reasonably have been entering the CVS with the intention of purchasing Red Bull. Furthermore, his alleged confession included a statement that he drank a Red Bull 'in the store' which did not seem to happen on the video, showing a lack of clarity regarding the events of the case. Ultimately, I was convinced by the other jurors that the trespass notice was damning evidence for conviction. Unfortunately, on further reflection, I now have tremendous doubt as to that decision. I could write great lengths on the facts of{**43 NY3d at 1040} the case which explain my doubt, but I recognize that it's too late. I feel deep remorse, which is why I felt the need to write to you regarding the sentence."
Although our case law is replete with decisions saying that we assume that juries follow the instructions of the court as to limitations on the way evidence can be used (see e.g. People v Morris, 21 NY3d 588, 598 [2013]), we are merely hopeful that the instructions are followed, not at all confident that they have been. Here, as the juror's note makes clear, it was not the video, not the testimony of the manager, and not Mr. Williams's statements on which the jury relied, but, instead, the trespass notice. Perhaps, as appellate judges, we have no choice but to assume the court's instructions are followed, but as I was once told, if you put a child in a room and say not to think about pink elephants, that's exactly what the child will think of.[FN3]
A 2020 survey of more than 1,000 Americans, conducted by the Associated Press-NORC Center for Public Affairs Research, showed that more than two thirds of those surveyed believed the U.S. criminal justice system (including the police, prosecutors, defense counsel, courts and prisons) either needed reforms or a complete overhaul.[FN4] More than four times as many thought a complete overhaul was required than those who thought no changes were needed. Those findings are in line with many other studies conducted over the past decade.[FN5] A majority of Americans also support treating addiction as a health problem rather than a criminal problem, and support treatment over{**43 NY3d at 1041} incarceration for people with drug addiction and mental illness.[FN6]
Mr. Williams's case illustrates so many of the reasons for that lack of trust and confidence. Persistent recidivist shoplifting is a significant problem. It is constantly frustrating for shoppers, who have to wait to have displays unlocked, and for retailers, who lose countless items to theft. But charging the attempted theft of two Red Bulls as felony burglary reveals a different persistent problem: the prosecutorial overcharging of petty offenses.[FN7] As explained by the current Manhattan District Attorney's office in its brief in this appeal, treating petty offenders with mental health and/or substance abuse problems as dangerous criminals is unhelpful, is a huge waste of taxpayer dollars that could be better spent on addressing those problems instead of incarceration, and is not now the paradigm used by that office.
Mr. Williams has struggled with substance abuse his entire life. He started abusing alcohol as a teenager, and since then, has spent most of his money toward feeding his drug and alcohol addiction. For at least 10 years prior to the instant offense, he was homeless and living without food stamps. He also suffered from diabetes, which, combined with his homelessness and drug use, meant that he was often sick from low blood sugar levels. During that period, Mr. Williams developed a lengthy criminal history of nonviolent misdemeanor petty{**43 NY3d at 1042} larceny, including 29 theft convictions, "all with similar facts" to the instant offense. Some of those convictions led to stints in prison, which was the only aid he received for his problems. If nothing else, his shoplifting recidivism showed that the current system is broken—it offered him no mental health, substance abuse or supportive housing that might have put him on a different path.
Instead, for moving two Red Bulls from the cooler to the checkout area, the court sentenced Mr. Williams to the maximum term allowable by law for third-degree felony burglary. In doing so, the sentencing court emphasized that the maximum term of 31/2 to 7 years was necessary "to keep him away from other people's property for as long as reasonable" and "the only fair sentence for the community." The community, though, paid more than a million dollars to incarcerate Mr. Williams. The severity of that sentence in relation to the offense also erodes public confidence in the criminal justice system, which is one of the reasons the Unified Court System, together with the executive and legislative branches, has been working to expand the availability of treatment courts and diversion programs.
IV.
Punishing Mr. Williams for offenses growing out of his addiction and poverty is neither necessary nor fair—not just unnecessary and unfair to Mr. Williams, but to the community at large. People living with mental illness or addiction in New York are much more likely to encounter the criminal justice system—even though community-based treatment is cheaper and more effective than services in prison.[FN8] Unhoused people are also much [*6]more likely—up to 11 times more likely—to be arrested than those who are housed.[FN9] But incarceration does nothing to address their health and housing needs. Misdemeanor convictions for offenses such as petty larceny reduce{**43 NY3d at 1043} earning potential and deepen inequality.[FN10] The resources we use to incarcerate those populations could be better spent on housing, job training and educational support. "Let's just be honest: there's nothing compassionate about letting people suffer without treatment on the streets."[FN11]
Some of the problems of housing scarcity and inequality are external, but there are many things courts, and others within the criminal justice system, can do. Our courts can ensure that individuals are not convicted on artificially heightened charges and can sentence defendants to mental health services instead of prison. District attorneys can follow New York County's example by prioritizing treatment rather than prison for those charged with low-level offenses. Finally, as the New York City Bar has set forth in a recent report, the Legislature can narrow the actions that should be punished through the criminal system and take steps to decriminalize minor crimes, change sentencing structures and reduce sentences overall.[FN12] We can build a better system that focuses on treatment and rehabilitation, not reflexive incarceration, so people like Mr. Williams can receive the resources they need to have the chance to build productive lives in the community, rather than be excluded from it.
Judges Rivera, Singas, Cannataro, Troutman and Genovesi[FN*] concur. Chief Judge Wilson dissents in an opinion, in which Judge Halligan concurs. Judge Garcia took no part.
Order affirmed, in a memorandum.

Footnotes

Footnote *:[2] Insofar as defendant and the dissent assert that defendant's confession was not sufficiently corroborated (see CPL 60.50) and therefore could not be used to establish defendant's guilt, defendant failed to preserve any such argument. In any event, the People introduced "additional proof that the offense charged ha[d] been committed" (id.).

Footnote 1: Jullian Harris-Calvin et al., The Cost of Incarceration in New York State, Vera Institute of Justice (Oct. 2022); New York City Comptroller's Office Budget Bureau, NYC Department of Correction FYs 2011-21 Operating Expenditures, Jail Population, Cost Per Incarcerated Person, Staffing Ratios, Performance Measure Outcomes, and Overtime (Dec. 2021).

Footnote 2: "[E]vidence is relevant 'if it tends to prove the existence or non-existence of a material fact, i.e., a fact directly at issue in the case' " (People v Cerda, 40 NY3d 369, 376 [2023], quoting People v Primo, 96 NY2d 351, 355 [2001]). Evidence is something that makes a factual proposition more likely true than false, and information that does neither is not evidence. Put differently, a piece of evidence that does not make a material fact more likely to be true is not evidence at all (cf. 1 McCormick on Evidence § 185 [8th ed, Jan. 2020 update] ["(T)o think about whether an item of evidence has probative value . . . one can simply ask, 'Does learning of this evidence make it either more or less likely that the disputed fact is true?' "]).

Footnote 3: See generally Krulewitch v United States, 336 US 440, 453 (1949, Jackson, J., concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction"); Paul S. Milich, The Degrading Character Rule in American Criminal Trials, 47 Ga L Rev 775, 780 (2013) ("Once the jury learns that the defendant has a criminal past, the odds of conviction skyrocket").

Footnote 4:Associated Press-NORC Center for Public Affairs Research, Widespread Desire for Policing and Criminal Justice Reform—June 2020 AP-NORC Center Poll, https://apnorc.org/projects/widespread-desire-for-policing-and-criminal-justice-reform/ (accessed Jan. 23, 2025).

Footnote 5: See e.g. ACLU, Smart Justice Campaign Polling on Americans' Attitudes on Criminal Justice: Topline Memo (Nov. 16, 2017), https://www.aclu.org/publications/smart-justice-campaign-polling-americans-attitudes-criminal-justice-topline-memo (accessed Jan. 23, 2025) (of the over 1,000 surveyed, "91% say that the criminal justice system has problems that need fixing").

Footnote 6:See ACLU, Press Releases, 91 Percent of Americans Support Criminal Justice Reform, ACLU Polling Finds (Nov. 16, 2017), https://www.aclu.org/press-releases/91-percent-americans-support-criminal-justice-reform-aclu-polling-finds (accessed Jan. 23, 2025) ("71 percent of Americans agree that incarceration is often counterproductive to public safety, since 'sending someone to prison for a long sentence increases the chances that he or she will commit another crime when they get out because prison doesn't do a good job of rehabilitating problems like drug addiction and mental illness' "); see also Legal Action Center, Public Opinion Supports Bold Action to Reform Nation's Drug and Criminal Justice Policies, https://www.lac.org/assets/files/LAC-polling-sheet-combo-no-crops.pdf (accessed Jan. 31, 2025) ("Most Americans [67%] believe we should treat addiction to opioids and other drugs more as a health problem rather than a criminal problem, including 78% of Democrats and 55% of Republicans").

Footnote 7: See generally Megan T. Stevenson & Sandra G. Mayson, The Scale of Misdemeanor Justice, 98 BU L Rev 731 (2018) (estimating that over 13 million misdemeanor cases are filed in the United States each year); Brennan Center, Hidden Toll: New York City's Misdemeanor System (finding that petit larceny and property-related charges increased in 2021 and 2022 after charges fell during the pandemic); People v Britt, 34 NY3d 607, 630 (2019, Wilson, J., dissenting) (citing scholarly literature in support of decriminalizing minor offenses and redirecting resources away from their prosecution).

Footnote 8: Erica Bryant, The United States Criminalizes People Who Need Health Care and Housing, Vera Institute (Oct. 17, 2023), https://www.vera.org/news/the-united-states-criminalizes-people-who-need-health-care-and-housing ("New York City spends an appalling $556,539 annually to jail people in hellish conditions on Rikers Island. In contrast, it costs about $42,000 to house someone in a supportive housing program that provides individualized services for people with behavioral health needs that can lead to incarceration"), citing New York City Comptroller's Office Budget Bureau, supra at n 1.

Footnote 9: National Law Center on Homelessness and Poverty, Housing Not Handcuffs (Dec. 2019) at 50.

Footnote 10: Ames Grawert et al., Poverty and Mass Incarceration in New York: An Agenda for Change, Brennan Center for Justice (Feb. 23, 2021), https://www.brennancenter.org/our-work/policy-solutions/poverty-and-mass-incarceration-new-york-agenda-change.

Footnote 11: Governor Kathy Hochul, 2025 State of the State Address (Jan. 14, 2025).

Footnote 12: Report by the Mass Incarceration Task Force, Corrections and Community Reentry Committee, and Criminal Justice Operations Committee, A Pathway Out of Mass Incarceration and Towards a New Criminal Justice System: Recommendations for the New York State Legislature, The Association of the Bar of the City of New York (May 2021), https://www.nycbar.org/wp-content/uploads/2023/05/2020883-APathwayOutOfMassIncarceration.pdf.

Footnote *:Designated pursuant to NY Constitution, article VI, § 2.